## pUNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THOMAS WALCZYK, ET AL     :     NO.: 3:02 CV 1536 (RNC)

v.     :

JAMES RIO, ET AL     :     FEBRUARY 2, 2004

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE CLAIMS OF THOMAS WALCZYK

Pursuant to D.Conn.L.R. 7 and 56 and Fed.R.Civ.P. 56, the defendants submit the following Memorandum of Law in support of their Motion for Summary Judgment as to the claims of Thomas Walczyk dated February 2, 2004. The defendants incorporate by reference the Local Rule 56 Statement dated February 2, 2004.

## I.    STATEMENT OF FACTS.

The operative facts that give rise to the plaintiff's complaint are best understood in the context of the history surrounding Thomas Walczyk and Tunxis Street, Farmington. This lawsuit has four plaintiffs, Thomas Walczyk, his wife, Maximina Walczyk, his daughter, Michelle Walczyk, and his mother, Elizabeth Walczyk. Thomas, Maximina and Michelle reside at 28 Tunxis Street. Elizabeth resides diagonally across the street at 27 Tunxis Street.

The defendants have submitted separate Motions for Summary Judgment as to the claims of Elizabeth, Michelle and Maximina Walczyk. All of the Motions refer to the single Local Rule 56 Statement which is incorporated herein by reference. .

### A.    LAND USE LAWSUITS

Sometime in the middle 1980s, Elizabeth and her now deceased husband, Lucien, brought a lawsuit against the owner of adjoining property to establish their agricultural rights to neighboring land. Eventually, they were successful. They also joined a lawsuit to prevent development in their neighborhood.

The homes of 27 and 28 Tunxis Street are on what appear to be a secluded cul-de-sac off of Route 6 in Farmington. At the time of this case, this section of Route 6 had

not seen much commercial development. The land behind the homes that made up the odd numbered side of Tunxis Street appears to have been farmland for many years. Other parts of that land were State forest. In the late 1980s, some section of that land near Route 6 was sold for development purposes as well as the land at the end of Tunxis Street. The land at the end was to be developed as a private road with new homes. Needless to say, none of the Walczyks were interested in development.

Sometime in the late 1980s or early 1990s, Lucian and Elizabeth Walczyk, owners of 27 Tunxis Street, participated in a lawsuit to block the development. They had used nearby land for flower gardening and farming and it was disturbed in the development process. They sued and established rights, but not ownership, to certain parts of the land.

Thomas Walczyk, perhaps emboldened by his parents' success, brought a lawsuit claiming that an adjoining parcel to his property was his by adverse possession. The defendant in that lawsuit, Barberino Realty, will feature prominently later in this motion. Despite his best efforts, Thomas' lawsuit was rejected and his appeals were unsuccessful. During this time, Thomas was openly hostile to Barberino Realty and its agents.

As to the land that was later developed as a private road, Thomas filed a lawsuit claiming he had title to the land by virtue of adverse possession. He filed suit in 1995 and not only lost on his principal claim, Walczyk v. Barberino Realty & Development Corporation, 1996 Ct. Sup. 990, 16 CLR 34, J.D. of Hartford/New Britain at New Britain, (Jan. 10, 1996, Arena, J.) (Exhibit R1) but Barberino Realty counterclaimed to quiet title and judgment was entered in favor of Barberino, Walczyk v. Barberino Realty & Development Corporation, 1997 Ct. Sup. 3126, J.D. of Hartford/New Britain at New Britain, (May 14, 1997, Keller, J.), Exhibit R2. By 1998 had lost all appeals. Walczyk v. Barberino Realty & Development Corporation, 48 Conn. App. 911, 719 A.2d 1233 (1998), Exhibit R3. The Connecticut Supreme Court refused to grant Walczyk's petition for certiorari. Walczyk v. Barberino Realty & Development Corporation, 245 Conn. 904, 719 A.2d 1165, cert. denied (1998), Exhibit R4. More than a year after he had lost his

last appeal, Thomas went to see Captain Rio in April or May 1999. Relevant to this portion of the discussion, however, is Thomas's comment to Rio that "he was taking steps to have the judge's decision thrown out." However, no appeals remained. Walczyk told Captain Rio that he would take matters into his own hands, if necessary. Captain Rio advised the defendant that, if he believed that someone was trespassing on his property, he should not take the matter into his own hands, but instead should call the police to take care of the problem.

Instead, Thomas, relying on some "common law" notion, concluded that despite his loss in court, he would only need to prevent the lawful owner, Barberino Realty, from entering the property for a year and then Barberino Realty would need to go back to court. Thomas believes that Conn. Gen. Stat. §52-575 provides this authority. While there is some language in section 52-575 that references entry to land and one year, there is nothing in section 52-575 that would allow any court to draw the same conclusion as Thomas has from the statute. It is Thomas's common law interpretation that leads him to place a gate across the access to the land in question despite the clear and unambiguous text of the Superior Court decision. It is Barberino Realty's construction agents who knock down the gate with a bulldozer on August 30, 1999 and leave a log splitter on the land that causes Thomas to call the Farmington Police. The remaining activity after August 30, 1999 will be detailed below.

## B.    PRIOR BRUSHES WITH THE LAW

Thomas Walczyk is no stranger to the law. In fact, he has had many brushes with the law, all or nearly all marked by threats of violence and/or the display of weaponry.

### 1.    1988 Incident.

In 1988, Thomas was arrested on the charges of Threatening, Reckless Endangerment in the First Degree, and Interfering with a Police Officer after he confronted surveyors and other workers from Barberino Realty. Thomas approached the men with a loaded AR-15 (civilian model M-16). The weapon had thirty (30) rounds in the clip and one round was locked and loaded in the chamber, ready to fire. After the Farmington Police arrived, Thomas initially refused the officers' lawful commands to

3

drop the weapon. Despite having two officers pointing their service weapons at him, Thomas refused to drop his weapon and continued to yell about trespassing and some state statute. Even after lowering his weapon, Thomas was uncooperative during the protective frisking phase and had to be physically restrained and handcuffed. *See* Exhibit J. As to the 1988 incident, Thomas Walczyk was originally charged with violations of Conn. Gen. Stat. §53a-22, Threatening, Conn. Gen. Stat. §53a-63, Reckless Endangerment in the First Degree by substitute information, and Conn. Gen. Stat. §53a-167a, Interfering with a Police Officer by substitute information. In this incident, Walczyk plead guilty to a violation of Conn. Gen. Stat. §53-181, Creating a Public Disturbance.

### 2. 1990 Incident.

In 1990, a Farmington resident followed Thomas in his motor vehicle back to his residence at 27 Tunxis Street after Thomas cut the resident off while driving. Seeing the person following him, Thomas went inside his residence and returned with a loaded AK-47 (Soviet model assault rifle). *See* Exhibit K. Thomas was charged with Threatening. As to the 1990 incident, Thomas Walczyk was originally charged with a violation of Conn. Gen. Stat. §53a-22, Threatening. The State's Attorney later entered a disposition of *nolle prosequi* as to this charge.

### 3. 1992 Incident.

In 1992, Thomas was charged with Breach of Peace, Unlawful Discharge of a Firearm, and Conspiracy to Commit Cruelty to Animals after a neighbor saw Thomas shoot his cat. Upon investigation, officers found two dead cats. Thomas told officers that he "has been shooting cats in his backyard for years." As to the 1992 incident, Walczyk was originally charged with violations of Conn. Gen. Stat. §53a-247, Cruelty to Animals, Conn. Gen. Stat. §53a-203, Unlawful Discharge of a Firearm by substitute information, and Conn. Gen. Stat. §53a-48, conspiracy to Commit cruelty to animals by substitute information. In this incident, Walczyk plead guilty to a violation of Conn. Gen. Stat. §53a-181, Breach of Peace.

### 4.    1996 Incident.

In 1996, Thomas was almost charged after an altercation with his brother, John. Thomas and John had an argument over Thomas' land dispute with Barberino Realty. John complained that Thomas pushed him twice during the argument. John called police and made a report even though he did not feel in fear of imminent physical injury. John was concerned because his brother Thomas owns several guns and could act on the threat. As to the 1996 incident, no charges were brought against Walczyk.

### C.    EVENTS OF AUGUST 30, 1999 THROUGH SEPTEMBER 7, 1999

The involvement of the Farmington Police Department and ultimate search and seizure at the Walczyks' residences stems from a longstanding dispute between Thomas Walczyk and real estate developer, Barberino Realty Corporation. Barberino Realty Corporation had sought to develop a portion of land it owned adjacent to Thomas Walczyk in the late 1980s. Walczyk, however, maintained that he owned the property by adverse possession. After several years of litigation, the Superior Court issued a decision stating that Barberino owned the entirety of the property and Walczyk had no right, title, or interest. Walczyk refused to accept this result, which he attributes to a "crooked judge."[1]

On August 30, 1999, Thomas Walczyk observed that a locked gate on property that he claimed to own (but knew he did not by virtue of a court decision more than 18 months earlier) had been knocked down and that a logging skidder had been parked on property that he thought belonged to him. He called the police to report this alleged trespass. In response, Officer David Hebert of the Farmington police department came to Walczyk's house. Hebert advised him to file a civil action to establish his property rights but indicated that he would take no further action until Walczyk could produce authoritative evidence of ownership. The defendant then told Officer Hebert that "the police weren't taking the necessary action to avoid a bloodbath." Before he left, Hebert

---

[1] *See* Walczyk v. Barberino Realty & Development Corporation, 1996 Ct. Sup. 990, 16 CLR 34, J.D. of Hartford/New Britain at New Britain, (Jan. 10, 1996, Arena, J.); Walczyk v. Barberino Realty & Development Corporation, 1997 Ct. Sup. 3126, J.D. of Hartford/New Britain at New Britain, (May 14,

warned the defendant that he would be arrested if he interfered with the work that was being done by the adjoining landowner.

Upon returning to the police station, Officer Herbert wrote a report concerning the incident. Upon review of Officer Hebert's report, Hebert's supervisors, including Captain Rio, Sergeant Tyler and Corporal Deschenes, all knowledgeable of Walczyk's prior brushes with the law, determined that they should seek an arrest warrant and a search warrant for firearms. On September 4, 1999, the police obtained both an arrest warrant for the defendant and a search warrant for his residence and that of his parents across the street. Both warrants were executed on September 7, 1999. Without informing the defendant of the arrest warrant, the police asked him to come to the police station to discuss the property dispute. He was then arrested and incarcerated. He was not told that the police were in the process of searching the family homes. While Thomas was in custody, the officers' conducted a search of the properties. They searched 27 Tunxis Street first and then moved to 28 Tunxis Street second.

Once Walczyk had left his residence, several police officers searched the two residences. In addition to seizing the six firearms specifically identified in the search warrant, the officers saw and seized a large number of firearms, piles of ammunition and related paraphernalia. In the view of the police, several of the firearms were loaded. The officers knew that some of Walczyk firearms were registered and licensed to him because that information, contained in records at the police station, was the source of their identification of the weapons for which they would search.

The Farmington police, together with assistance from some members of the West Hartford police department, executed the search warrants on September 4, 1999. Although the assisting members from West Hartford were part of the emergency response team, none of them was dressed in SWAT uniforms nor were any special weapons or tactics employed.

The officers recovered nearly 70 weapons from Thomas Walczyk's home and an

---

1997, Keller, J.). Walczyk v. Barberino Realty & Development Corporation, 48 Conn. App. 911, 719 A.2d 1233, *affirm'd*, 245 Conn. 904, 719 A.2d 1165, *cert. denied*, (1998).

additional 19 from Lucian Walczyk's home. The search proceeded without incident. The officers guaranteed that Thomas Walczyk would not barricade himself in his home by implementing a ruse to draw him out. Sergeant Jepsen called Thomas Walczyk and asked him to come to the Farmington police department to discuss the land dispute with Barberino Realty prior to the search warrants being executed. Walczyk was then arrested pursuant to the warrant for threatening, and the search team was given the green light to proceed. During the search of Thomas Walczyk's home, loaded automatic weapons were found in several locations easily accessible to minors such as (1) in the kitchen behind boxes of cereal; and (2) in the family room areas. Accordingly, Walczyk was also arrested on the additional charges of reckless endangerment, risk of injury to a minor and improper storage of a firearm. While on scene, the Farmington officers also seized thousands of rounds of ammunition from the home. Although the search warrant did not specifically authorize seizure of ammunition, the officers contacted a prosecutor during the search and the prosecutor advised them to seize the ammunition as well, given that it is an inherently dangerous commodity.

Walczyk was tried based on the State's ten count information against him. The State charged the defendant with risk of injury to a child under Conn. Gen. Stat. §53-21. The trial court acquitted him of that charge. The State also charged him with threatening under §53a-62. The jury acquitted him of that charge. Further, the state charged him with disorderly conduct under General Statutes § 53a-182 (a)(2) and reckless endangerment under General Statutes § 53a-64. The jury found him guilty of those charges. The court also found Walczyk guilty of two out of six counts of violating the improper firearm storage statute.

Walczyk appealed his state court convictions and the convictions were overturned on appeal. The court concluded that probable cause lacked to issue the search warrant to obtain evidence of threatening. State v. Walczyk, 76 Conn. App. 169, 818 A.2d 868 (2003).

### D.    PRESENT ACTION

As plaintiff, Thomas Walczyk, with his co-plaintiffs, Elizabeth Walczyk, Maximina

Walczyk and Michelle Walczyk, has brought a two count complaint claiming his federal and state constitutional rights were violated.

The plaintiffs have identified the following Farmington police offices as defendants: Captain James V. Rio, Detective Brian Killiany, Sergeant James Jepsen, Sergeant William Tyler Corporal Angela Deschenes, and Officer Shawn Brown. The officers are sued in their individual capacities only. There is no claim based on <u>Monell v. Dept. of Soc. Servs.</u>, 436 US 658 (1978), but the plaintiffs seek to impose supervisory liability upon Captain Rio. Without much specification, the plaintiffs claim that all of the defendants violated their First, Second, Fourth, Eighth and Fourteenth Amendment Rights. Plaintiff's counsel has agreed to withdraw the First Amendment claims on behalf of all plaintiffs.

The defendants now move for summary judgment on the plaintiff's entire Amended Complaint dated April 7, 2003.

## II.    LAW AND ARGUMENT.

### A.    STANDARD OF REVIEW.

Federal Rules of Civil Procedure 56(c) requires the entry of summary judgment ". . . if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A factual dispute is "genuine" when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A "material fact" is one whose resolution will affect the ultimate determination of the case. <u>Id</u>. In determining whether a material issue of fact exists, the court must resolve all ambiguities and draw all inferences against the moving party. <u>Id</u>. at 255, 106 S.Ct. at 2513; <u>J.F. Feeser, Inc. v. Servi-A-Portion, Inc.</u>, 909 F.2d 1524, 1531 (3d Cir. 1990), <u>cert. denied</u>, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that

8

there be no genuine issue of material fact." <u>Samuels v. Smith</u>, 839 F.Supp. 959, 962 (D.Conn. 1993).

The party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 256, 106 S.Ct. 1570, 94 L.Ed.2d 763 (1987); <u>Quinn v. Syracuse Model Neighborhood Corp.</u>, 613 F.2d 438, 445 (2d Cir. 1980). Thus, once the moving party has satisfied its burden of identifying evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party is required to go beyond the pleadings by way of affidavits, depositions, and answers to interrogatories in order to demonstrate specific material facts which give rise to a genuine issue. <u>Celotex Corp. V. Catrett</u>, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed. 25 (1986). "Neither courts nor defendants should be subjected to trials which can be little more than harassment." <u>Applegate v. Top Associates, Inc.</u>, 425 F.2d 92, 96 (2d Cir. 1970).

When Rule 56(e) shifts the burden of proof to the non-moving party, that party must produce evidence to show the existence of every element essential to the case which it bears the burden of proving at trial. <u>Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.</u>, 812 F.2d 141, 144 (3d Cir. 1987). Where evidence is submitted in support of, or in opposition to, a motion for summary judgment, such evidence must be presented in a manner consistent with its admissibility at trial. <u>See First National Bank of Clinton, Ill. v. Insurance Co. of North America</u>, 606 F.2d 760 (7th Cir. 1979) (in ruling on summary judgment motion, the district court properly relied on documents and exhibits identified by affidavit). Unsworn statements of the parties, letters addressed to litigants from third persons, and hearsay that does not fall under one or more of the exceptions listed in Rules 803-805 of the Federal Rules of Evidence, may not properly be considered. <u>See</u>, <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); <u>Beyene v. Coleman Security Services, Inc.</u>, 854 F.2d 1179 (9th Cir. 1988); <u>Edward B. Marks Music Corp. V. Stasny Music Corp.</u>, 1 F.R.D. 720 (S.D.N.Y. 1941).

In determining whether there is a genuine issue as to any material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *See* <u>Anderson</u>, 477 U.S. at 255; Gallo, 22 F.3d at 1223; <u>Ramseur v. Chase Manhattan Bank</u>, 865 F.2d 460, 465 (2d Cir. 1989); <u>Project Release v. Prevost</u>, 722 F.2d 960, 968 (2d Cir. 1983). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See* <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).).

However, the nonmoving party "may not rest upon mere conclusory allegations or denials." *See* <u>Podell v. Citicorp Diners Club, Inc</u>., 112 F.3d 98, 101 (2d Cir. 1997) (internal citations omitted). On a motion for summary judgment, a court cannot try issues of fact; it can only determine whether there are issues to be tried. *See* <u>Anderson</u>, 477 U.S. at 255; <u>Donahue v. Windsor Locks Bd. of Fire Comm'rs</u>, 834 F.2d 54, 57 (2d Cir. 1987). The function of the court at this stage is not to weigh the evidence and determine what is true, but rather to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 322-23. *Accord,* <u>Goenaga v. March of Dimes Birth Defects Foundation</u>, 51 F.3d 14, 18 (2d. Cir. 1995) (movant's burden satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim). *See also* <u>Schacht v. Wisconsin Dep't of Corrs.</u>, 175 F.3d 497, 503-04 (7th Cir. 1997) (noting summary judgment is the "'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of act to accept its version of events"); *rev'd on other grounds*, 524 U.S. 381 (1998).

10

**B.    PLAINTIFF'S CLAIMS BASED ON DUE PROCESS FAIL TO STATE CLAIMS UPON WHICH RELIEF MAY BE GRANTED AS A MATTER OF LAW.**

The plaintiff alleges that his federal constitutional due process rights were violated in two ways: one direct and one oblique. The direct claim is in paragraph 29g where the plaintiff claim that his "right not to have property seized and withheld from its owners without due process" was allegedly violated by the defendants' actions. It seems the direct claim is for procedural due process. The oblique claim is not well-formed in the plaintiff's Amended Complaint. While the plaintiff's Amended Complaint does not mention a violation of substantive due process, he does allege that he suffered a "deprivation of liberty." Unfortunately, the plaintiff does not make specific allegations in this regard. Nonetheless, the defendants address both due process claims in turn.

### 1.    Substantive Due Process Claim.

In 1989, the U.S. Supreme Court addressed the limits of substantive due process and concluded that where there is a specific constitutional provision affecting the conduct at issue, a more generalized substantive due process claim is preempted. "Where a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of governmental behavior, 'the Amendment, not the more generalized notion of substantive due process' must be the guide for analyzing these claims.'" Albright v. Oliver, 510 U.S. 272, S.Ct. 807, 127 L.Ed.2d 114 (1994), citing, Graham v. Connor, 490 U.S. 395.

In Graham, the Supreme Court held that claims of excessive force brought under Section 1983 must be analyzed under the explicit textual sources of protection found in the Fourth [Amendment], not the more general standard of "substantive due process." Id. at 490. The Court reaffirmed the Graham rule in Albright v. Oliver, supra, where the plaintiff alleged that the defendants violated his right to "substantive due process" by initiating a criminal prosecution without probable cause. Albright v. Oliver, 510 U.S. 272. The Court noted that "[t]he Framers considered the subject matter deprivations of liberty, and drafted the Fourth Amendment to address it." Id. at 274. Because an explicit textual provision of the Constitution protected against the area of governmental

conduct challenged by the plaintiff, Graham precluded the plaintiff from obtaining additional relief under the notion of substantive due process. Id.

Both Graham and Albright are on point with the instant case. The facts which appear to support the plaintiff's nebulous "deprivation of liberty claim" must be analyzed under the explicit textual sources of protection found within the Fourth Amendment, not the more general notion of substantive due process. The same analysis applies to the plaintiff's conclusory equal protection claim. Summary judgment is appropriate, and the plaintiff's Fourteenth Amendment claims should be dismissed as a matter of law.

### 2.   Procedural Due Process Claims.

The defendants also submit that the allegations set forth in paragraph 29g – "right not to have property seized and withheld from its owners without due process" – is covered by an explicit textual source - the Fourth Amendment and should be analyzed as such. To the extent that it is not, the defendants offer the following analysis:

#### i.   Procedural Due Process.

The federal courts have long held that in order to satisfy the requirements of procedural due process, a property owner must receive notice and an adequate opportunity to be heard before being deprived of property. The alleged violations of procedural process occurred in a number of different contexts, according to plaintiffs' complaint. The Fourteenth Amendment prohibits the States —from depriving "any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1. Due process requires that "an individual be given an opportunity for a hearing before he [or she] is deprived of any significant property interest." Boddie v. Connecticut, 401 U.S. 371, 379 (1971). In order to state a claim of a procedural due process violation, a plaintiff must allege (1) an asserted individual interest encompassed within the Fourteenth Amendment's protection of "life, liberty, or property," and (2) that the procedures available denied him or her of "due process of law." Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000) (citing Robb v. City of Philadelphia, 733 F.2d 286, 292 (3d Cir. 1984)). "The requirements of procedural due process apply only to the deprivation

of interests encompassed by the Fourteenth Amendment's protection of liberty and property." Board of Regents v. Roth, 408 U.S. 564, 569 (1972).

The test for procedural due process has been set forth in Matthews v. Eldridge, 424 U.S. 319 (1976). That case held that when a private interest is affected what process is due depends on "the risk of an erroneous deprivation of such interest through the procedure used and the probable value, if any, of additional or substitute safeguards "and" the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." Id. 335. Cases like Connecticut v. Doehr, 501 U.S. 1 (1991), and Memphis Light, Gas and Water Division v. Craft, 436 U.S. 1 (1978), basically follow the direction given by the Matthews analysis.

Two quotes from 16B AM.JUR.2D, CONSTITUTIONAL LAW nicely sum up the law in this area in their view of the application of Matthews to particular cases:

> The requirements of due process frequently vary with the type of proceeding involved. Procedural due process in the administrative setting does not always require application of the judicial model. Due process is flexible and calls for such procedural protections as the particular situation demands; the quantum and quality of the process due in a particular situation depends on the need to serve the due process function of minimizing the risk of error in decision making.

(§ 904, p. 490). See also Hannah v. Larche, 363 U.S. 420, 442 (1960); Dixon v. Love, 431 U.S. 105, 112 et. seq (1977); Gilbert v. Homan, 520 U.S. 924, 928, et seq. (1997).

The same article makes another pertinent observation:

> Though the primary function of legal process is to minimize the risk of erroneous decisions, the Due Process Clause does not mandate that all governmental decision making comply with standards that assure perfect, error-free determinations.

(§ 902, p. 489); see also Mackey v. Montrym, 443 U.S. 1, 13 (1979).

And it is also true that "the due process clause does not . . . require a state to adopt one procedure over another on the basis that it may produce results more favorable to" the party challenging the existing procedure," Heller v. Doe, 509 U.S. 312,

332 (1993), *quoting* <u>Medina v. California</u>, 505 U.S. 437, 451 (1992) (§ 908 16B Am.Jur.2d, p. 498).

### ii.    *Walczyk Received All The Process He Was Due.*

Walczyk's claims in the Amended Complaint dated April 7, 2003 ignore the fact that before his property was seized, a neutral judicial officer issued a search warrant based on probable cause.  He cannot claim an inadequate pre-deprivation process; Walczyk's claim must be limited to the Fourth Amendment. As the Supreme Court has stated, "the Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of person or property in criminal cases. . . ." <u>Gerstein v. Pugh</u>, 420 U.S. 103, 125 n. 27 (1975). Certainly, the seizure of the property pursuant to the valid search warrant was not unreasonable.

The valid warrant based on probable cause afforded Walczyk the "process" that was "due" him with regard to the seizure of items during the execution of the warrant. *See, e.g.,* <u>Pino v. Higgs</u>, 75 F.3d 1461, 1469 (10th Cir. 1996) ("In this context, procedural due process affords Appellant no more protection than her right to be free from unreasonable seizure . . ."). Even if the seizure is analyzed under the due process clause, Walczyk's claim still fails with regard to the initial seizure in question. The Due Process Clause of the Fourteenth Amendment prohibits the States from depriving any person of property without "due process of law." CONST. AMEND. XIV. The Supreme Court has determined these words to require that a citizen be given notice and an opportunity to be heard before a government official seizes his property. <u>Mullane v. Central Hanover Tr. Co.</u>, 339 U.S. 306, 313 (1950); <u>Fuentes v. Chevin</u>, 407 U.S. 67, 80-82 (1972). The requirement is not without exception, however. As the Supreme Court has recognized, certain situations of immediate seizure without pre-deprivation notice and hearing are tolerated in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the [seizure]." <u>James Daniel Good Real Property</u>, 510 U.S. at 53 (*quoting* <u>Boddie v. Connecticut</u>, 401 U.S. 371, 379 (1971)). The Supreme Court has specifically stated that such circumstances

exist with regard to seizure of possessions under a search warrant. Fuentes, 407 U.S. at 93 n. 30. The Farmington Officers were armed with a search warrant signed by a neutral magistrate. Thus, Walczyk was not entitled to pre-deprivation notice or hearing before the items were seized from the house.

With regard to any post-deprivation procedural due process claim (the return of the firearms), Walczyk, at the time of the commencement of his action in the District Court, had failed to exhaust the remedies available to him under Connecticut law. because Connecticut law provides adequate post-deprivation remedies for the return of his personal property, his due process claim fails. See Walden v. Carmack, 156 F.3d 861, 874 (8th Cir. 1998) (adequate post-deprivation remedy precludes due process violation); Perkins v. West Covina, 113 F.3d 1004, 1011 (9th Cir. 1997) (no procedural due process claim where state provides adequate post-deprivation remedy) rev'd on other grounds, 525 U.S. 234 (1999). See also Hudson v. Palmer, 468 U.S. 517, 533 (1984) ("[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available."). Of course, Walczyk ignores that the state court was the exclusive body able to release the firearms. The Farmington Police could not have returned the firearms even if they wanted to do so. To return the firearms would mean to disobey the order of the state court. Walczyk admits this fact.

Indeed, there was an adequate post-deprivation process. In the context of the appeal of his criminal conviction, the criminal court ordered the seized items retained until the disposition of all appeals. Once the appeal was disposed of, all of the seized items were returned to Walczyk. The Farmington Police had no power to release the firearms absent a court order. The Farmington Police could not disobey the orders of the state criminal court.

Walczyk was represented by counsel in the criminal proceedings and had counsel available to engage in any post-deprivation process necessary for the return of the weapons. The Farmington officers were under no obligation under the Due Process

clause to give Walczyk notice with regard to procedures for obtaining return of the property. In <u>City of West Covina v. Perkins</u>, 525 U.S. 234 (1999), the Supreme Court held that when property is seized for a criminal investigation, due process does not require the police to provide the owner with notice of state law remedies which are established by published, generally available state statutes and case law. The Court explained, "Once the property owner is informed that his property has been seized, he can turn to these public sources to learn about the remedial procedures available to him." <u>Perkins</u>, 525 U.S. at 241. Walczyk did and upon the conclusion of the criminal proceedings, his property was returned to him.

Accordingly, summary judgment should enter in favor of the defendants on the plaintiff's due process claims.

### C.    PLAINTIFF'S EQUAL PROTECTION CLAIM FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

In paragraph 29d, the plaintiff appears to press an equal protection claim pursuant to a "class of one" theory, claiming that his "right not to be subjected to discrimination and unequal treatment due to the animosity of public officials." The defendants submits that they are entitled to summary judgment as to a "class of one" claim for the following reasons: (i) the plaintiff cannot maintain an equal protection "class of one" claim absent evidence of malice or bad faith; (ii) the plaintiff cannot maintain an equal protection "class of one" claim where he has suffered no differential treatment; (iii) other similarly situated individuals were not treated differently.

In <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 565 (2000), the plaintiff alleged that "the Village intentionally demanded a 33-foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15-foot easement from other similarly situated property owners." The plaintiff further alleged that said demand was irrational and wholly arbitrary. <u>Id</u>. The Court held that these allegations were sufficient to survive a 12(b)6 motion for failure to state a cognizable claim under the Equal Protection Clause. <u>Id</u>. at 563, 565.

Prior to Willowbrook, the rule in the Second Circuit was that a selective enforcement claim under the Equal Protection Clause required a showing that: "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Giordano v. City of New York, 274 F.3d 740, 750-51 (2nd Cir. 2001); see also, Harlen Associates v. Incorporated Village of Mineola, 273 F.3d 494, 499 (2nd Cir. 2001). To date, the Second Circuit has expressly declined to address the issue of whether Willowbrook has changed this Circuit's long-standing requirement that a "class of one" plaintiff show malice or bad faith. See Giordano, 274 F.3d at 751; Harlen, 273 F.3d at 500. This Circuit has, however, stated that a "class of one" plaintiff must still show "not only 'irrational and wholly arbitrary' acts, but also intentional disparate treatment." Giordano, 274 F.3d at 751 (internal citations omitted).

An essential element of a "class of one" claim is that the plaintiff was treated differently from all others similarly situated. See Willowbrook, 528 U.S. at 564; Jackson v. Burke, 256 F.3d 93, 96-97 (2nd Cir. 2001); Giordano, 274 F.3d at 750-51; and Harlen, 273 F.3d at 499. When plaintiffs seek to draw inferences of discrimination by showing that they were "similarly situated in all material respects" to the individuals to whom they compare themselves, Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997), their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances. Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000); see also McGuinness v. Lincoln Hall, 2001 WL 993572 (2d Cir. 2001). What is key is that they be similar in significant respects. Id. Accord, Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2nd Cir. 2001).

## 2.   Thomas Walczyk's Equal Protection Claim Fails.

### i.   There Is No Evidence Of Malice Or Bad Faith.

In this case, there is no evidence that any of the defendants acted out of vindictiveness or ill-will towards the plaintiff. Notably, nearly all of the named defendants had no prior personal contact with Walczyk or his family and Walczyk, himself,

concedes he has no evidence that any of the defendants were motivation by ill-will or harbored any animus towards him. As such, the plaintiff's claim must fail. Justice Breyer wrote the following in his concurring opinion in Willowbrook:

> The Solicitor General and the village of Willowbrook have expressed concern lest we interpret the Equal Protection Clause in this case in a way that would transform many ordinary violations of city or state law into violations of the Constitution. It might be thought that a rule that looks only to an intentional difference in treatment and a lack of a rational basis for that different treatment would work such a transformation.... This case, however, does not directly raise the question of whether the simple and common instance of a faulty zoning decision would violate the Equal Protection Clause...because the respondent had alleged an extra factor as well - a factor that the Court of Appeals called "vindictive action," "illegitimate animus," or "ill will."... [T]he presence of that added factor in this case is sufficient to minimize any concern about transforming run-of-the-mill zoning cases into cases of constitutional right.

Willowbrook, 528 U.S. at 565-66 (Breyer, J., concurring).

Prior to Willowbrook, the Second Circuit consistently held that malice or bad faith was essential to proving a "class of one" equal protection claim. *See* Giordano, 274 F.3d at 750-51; Harlen, 273 F.3d at 499; Lisa'a Party City, Inc. v. Town of Henriettta, 185 F.3d 12, 16 (2nd Cir. 1999); LeClair v. Saunders, 627 F.2d 606, 609-10 (2nd Cir. 1980). That law is unchanged. As stated above, the Second Circuit has yet to address the issue of whether a plaintiff must prove malice of bad faith in light of Willowbrook. It is important to note, however, that in Willowbrook, the Court was deciding only whether the plaintiff's complaint could survive a 12(b)6 motion. Moreover, Justice Breyer noted that personal animus was alleged in Willowbrook. Other circuits have interpreted Willowbrook as not eliminating the personal animus requirement. *See* Harlen, 273 F.3d at 500, *citing*, Hilton v. City of Wheeling, 209 F.3d 1005, 1008 (7th Cir. 2000), *cert. denied*, 531 U.S. 1080 (2001); Shipp v. McMahon, 234 F.3d 907, 916 (5th Cir. 2000). The defendant urges this court to do the same.

Plaintiff has no evidence that any of the defendant officers harbored any malice, personal animus or ill will. Absent any evidence of malicious intent, the plaintiff's "class of one" claim must fail.

### ii.    Thomas Walczyk Was Not Treated Differently.

What really happened? A threatening remark was made and based on the plaintiff's past history, police officers exercised their discretion and applied for arrest and search warrants. These officers participated in the same process as any other criminal investigation. Following approval by a neutral magistrate, the officers executed the warrant in a manner to maximize safety of all involved - both the officers and the target. Walczyk was booked, printed and photographed like any other suspect. Reports were written just like any other report. Walczyk's bond was set like any other and he was detained until the process was complete and the search was completed. In this case, the search uncovered additional facts that warranted additional charges. Additional charges required Walczyk to be booked and processed on those additional charges. This is no different from any other individual who has been subject to arrest or search warrants.

Indeed, the plaintiff has no evidence that he was treated differently. Plaintiff offered no evidence of different treatment in his discovery responses or at his deposition. Captain Rio avers that Thomas Walczyk was treated just like any other suspect. Plaintiff cannot contradict this evidence. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-3 (1986). Accord, Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d. Cir. 1995) (movant's burden satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim). See also Schacht v. Wisconsin Dep't of Corrs., 175 F.3d 497, 503-04 (7th Cir. 1997) (noting summary judgment is the "'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of act to accept its version of events"); rev'd on other grounds, 524 U.S. 381 (1998). Therefore, summary judgment is appropriate in favor of the defendants.

### *Iii.   Thomas Walczyk Was Treated Just Like Other Similarly Situated Individuals.*

In the past, officers of the Farmington Police Department have participated in criminal investigations, applications for arrest warrants, and applications for search warrants. These activities are no different from the steps taken by the Farmington officers with regard to Thomas Walczyk. In fact, members of Farmington Police Department, including some of the individual defendants, have undertaken criminal investigations of threats when the suspect is an owner of firearms. They have applied for both arrest and search warrants and executed those warrants with the same goals in mind as they had when they acted with regard to Thomas Walczyk. The plaintiff, however, has no evidence that similarly situated persons were treated differently.

In 1999, members of the Farmington Police Department seized firearms in Newington after a consent search failed to uncover weapons located at a Farmington residence following threats made by a suspect against his family. While the crime of threatening occurred in the Town of Farmington, the officers had information that the suspect stored weapons outside of Farmington. Based on the investigation, the officers applied for search and arrest warrants. The seizure was completed in a manner that maximized the safety of all involved; just like Walczyk. Walczyk was treated just like similarly situated people and Walczyk has no evidence to the contrary. *See* Exhibit Q, Aff. Rio. *See also* <u>Schacht v. Wisconsin Dep't of Corrs.</u>, 175 F.3d 497, 503-04 (7th Cir. 1997) (noting summary judgment is the "'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of act to accept its version of events"); *rev'd on other grounds*, 524 U.S. 381 (1998). Therefore, summary judgment is appropriate in favor of the defendants.

### D.   PLAINTIFF FAILS TO STATE A CLAIM FOR A VIOLATION OF HIS SECOND AMENDMENT RIGHTS.

In a particular exercise of imagination, the plaintiff claims his rights under the Second Amendment were violated. In particular, the plaintiff claims the defendants' actions abridged his "right to own and maintain lawfully registered firearms for self-defense. Paragraph 29e.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." CONST. AMEND. II. The link that the amendment draws between the ability "to keep and bear Arms" and "[a] well regulated Militia" suggests that the right protected is limited, one that inures not to the individual but to the people collectively, its reach extending so far as is necessary to protect their common interest in protection by a militia. The Supreme Court's jurisprudence on the scope of this amendment is quite limited itself, and not entirely illuminating. More than sixty years ago, however, the Supreme Court did reject a Second Amendment challenge to an indictment charging the defendants with the unlawful transport in interstate commerce of an unregistered, double-barrel, twelve-gauge Stevens shotgun with a barrel length of less than eighteen inches. United States v. Miller, 307 U.S. 174 (1939).

In the absence of "some reasonable relationship" between the firearm and "the preservation or efficiency of a well regulated militia," the Supreme Court concluded, "we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument." Id. at 178. See also Lewis v. United States, 445 U.S. at 65 n. 8; Konigsberg v. State Bar of Calif., 366 U.S. 36, 49 n. 10 (1961); Adams v. Williams, 407 U.S. 143, 151-52 (1972) (Douglas, J., dissenting); Quilici v. Village of Morton Grove, 695 F.2d 261, 270 (7th Cir. 1982), cert. denied, 464 U.S. 863 (1983); United States v. Three Winchester 30-30 Caliber Lever Action Carbines, 504 F.2d 1288, 1290 n. 5 (7th Cir. 1974) (cited with approval by Lewis v. United States, 445 U.S. at 65 n. 8); United States v. McCutcheon, 446 F.2d 133, 135-36 (7th Cir. 1971).

Whatever questions remain unanswered, Miller and its progeny do confirm that the Second Amendment establishes no right to possess a firearm apart from the role possession of the gun might play in maintaining a state militia. United States v. Wright, 117 F.3d 1265, 1271-72 (11th Cir.), cert. denied, 118 S.Ct. 584 (1997), vacated in part on reh'g on other grounds, 133 F.3d 1412 (11th Cir.), cert. denied, 119 S.Ct. 217 (1998); United States v. Hale, 978 F.2d 1016, 1019-20 (8th Cir. 1992), cert. denied, 507 U.S. 997, 113 S.Ct. 1614 (1993).

Walczyk has alleged no facts to suggest that his possession of a gun was related to state militia activities. He is not now in the military service of the United States of American and he has never been. He is not now in the military reserve and has never been. Moreover, to the extent that his claim contemplates activity already covered by the Fourth Amendment, his claimed injury must be analyzed under the explicit textual source in the Constitution which governs the conduct complained of. *Accord,* Albright v. Oliver, 510 U.S. 272, S.Ct. 807, 127 L.Ed.2d 114 (1994).

Moreover, the right he seeks to enforce is neither a fundamental right nor an individual right. In addition to the language in Miller, further support for the conclusion that the Second Amendment does not secure an individual right is found in Second Circuit authority, *see* United States v. Toner, 728 F.2d 115, 128 (2d Cir. 1984)("the right to possess a gun is clearly not a fundamental right"), and the heavy weight of authority in other circuits. *See* Silveira v. Lockyer, 312 F.3d 1052, 1066 (9th Cir. 2002) ("[T]he Second Amendment does not provide an individual right to own or possess guns or other firearms[.]"); United States v. Graham, 305 F.3d 1094, 1106 (10th Cir. 2002), *cert. denied*, 537 U.S. 1142 (2003) (the right to bear arms is a collective rather than an individual right); Love v. Pepersack, 47 F.3d 120, 124 (4th Cir. 1995) ("[T]he amendment does not confer an absolute individual right to bear any type of firearm."); United States v. Warin, 530 F.2d 103, 106 (6th Cir. 1976) ("It is clear that the Second Amendment guarantees a collective rather than an individual right."); Dew v. United States, 1998 WL 159060, *6 (S.D.N.Y. 1998), aff'd on other grounds 192 F.3d 366 (2d Cir. 1999) ("It is settled constitutional law that the Second Amendment is not a source of individual rights."); Hamilton v. Accu-Tek, 935 F. Supp. 1307, 1318 (E.D.N.Y. 1996) (same).

Accordingly, his Second Amendment claim against defendants must fail and summary judgment must enter in favor of the defendants on this claim.

E.    **PLAINTIFF'S CLAIM BASED ON THE EIGHTH AMENDMENT IS BARRED BY THE DOCTRINE OF ABSOLUTE JUDICIAL IMMUNITY.**

Despite clear and unambiguous precedent in the District of Connecticut, the plaintiff presses his claim that his Eighth Amendment rights were violated in the course of his arrest and detention. In particular, Walczyk claims his "right not to be subjected to excessive bail" was violated. This claim must be dismissed because the Farmington Police Officers are absolutely immune from personal-capacity suits for monetary damages under 42 U.S.C. § 1983 for actions related to performing the bail setting function assigned to Connecticut police officers under Conn. Gen. Stat. § 54-63c. *See* Sanchez v. Doyle, 254 F. Supp.2d 266, 269-273 (D. Conn. 2003); *accord*, Clynch v. Chapman, (Conn. 2003) Slip. Op. (attached hereto).

As discussed by Judge Arterton in her well-reasoned decisions in Sanchez and in Clynch: "It is . . . well established that officials acting in a judicial capacity are entitled to absolute immunity against § 1983 actions, and this immunity acts as a complete shield to claims for money damages." Montero v. Travis, 171 F.3d 757, 760 (2d Cir. 1999). Judge Arterton concluded that the setting of bail or bond in Connecticut is a judicial act. Under the functional analysis, Judge Arterton determined that the critical inquiry focuses on the nature of the act being performed and not on the status of the individual performing it. *See* Forrester v. White, 484 U.S. 219, 224 (1988)("It is the nature of the function performed, not the identity of the actor who performed it, that informed our immunity analysis."). Based on that analysis, Judge Arterton concluded that setting bail in Connecticut is a judicial act. Therefore, like officers Chapman and Froshino in Clynch, the Farmington officers who set bail for Thomas Walczyk was "functionally comparable to that of a judge." Butz v. Economou, 438 U.S. 487, 513 (1978).

In Sanchez and Clynch, Judge Arterton reviewed the bail-setting/bond process in Connecticut. To set bond, Conn. Gen. Stat. §§ 54-63c(a) requires the officer to attempt to conduct an interview with the arrested person to obtain information relevant to the terms and conditions of the person's release from custody such as the nature and

23