circumstances of the offense insofar as they are relevant to the risk of nonappearance, defendant's record of previous convictions, past record of appearance in court after being admitted to bail, family ties, employment record, financial resources, character and mental condition, and community ties. See Conn. Gen. Stat. §§ 54-63c(a) and § 54-63b(a) and (c). Weighing those factors to determine the appropriate bond demonstrates "independent judgment," Butz, 438 U.S. at 513, especially in light of the fact that, if the arrested person posts the bail set by the officer, the officer's determination is not reviewed and the arrested person is released until arraignment (as happened in Clynch's (and here in Walczyk situation). In addition, when the arrested person cannot post the officer-determined bond and the officer is required to refer the matter to a bail commissioner, see Conn. Gen. Stat. §§ 54-63c(a), 54-63d(a), & 54-63b(a), the police department retains statutory discretion to advise the state's attorney of its objection to a bail commissioner's re-determination such that the state's attorney may then authorize it to delay release pending a hearing before a superior court judge, see Conn. Gen. Stat. § 54-63d(d). In setting bail, therefore, officers like Captain Rio cannot be said to perform merely administrative functions, see King v. Simpson, 189 F.3d 284, 288 (2d Cir. 1999), but rather are serving independent judicial functions and exercising independent judgment in setting and reviewing bail conditions.

Walczyk cannot now claim malice or bad faith. See Mireless v. Waco, 502 U.S. 9, 11 (1991) ("[J]udicial immunity is not overcome by allegations of bad faith or malice"). Walczyk was protected by the same safeguards that Judge Arterton found to be adequate to protect against constitutional violations which reduce the need for private damage actions. Indeed, the same logic should apply here. It is undisputed that at the time of his arrest, bonding and release, Thomas Walczyk never claimed he could not make bond. Thus, without a claim to the bail-setting authorities that he could not post the bail as set, Walczyk never received a re-determination by a bail commissioner (the built-in safeguard). It is undisputed that neither Walczyk, nor anyone on his behalf, ever contested the amount of the bail until long after his release and the commencement of this lawsuit. It is undisputed that Walczyk never sought a commissioner's re-determination. It is undisputed that Elizabeth Walczyk, his mother, posted bond.

24

Accordingly, summary judgment should enter in favor of the defendants on the claim that the plaintiff's Eighth Amendment rights were violated.

### F. THE DOCTRINE OF QUALIFIED IMMUNITY IS A COMPLETE BAR TO ALL OF THE PLAINTIFF'S CLAIMS.

In response to the plaintiff's complaint, the individual defendants have asserted their actions are protected by the doctrine of qualified immunity.

#### 1. Doctrine of Qualified Immunity.

The defense of qualified immunity shields government agents "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." McEvoy v. Spencer, 124 F.3d 92, 97 (2d Cir. 1997), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It is more than just a defense; the doctrine of qualified immunity is an immunity from suit. Locurto v. Safir, 264 F.3d at 163. (emphasis added.)

A right is "clearly established" when "[t]he contours of the right [are] . . . sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . [T]he unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987). See, e.g. Malley v. Briggs, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly break the law"); Mitchell v. Forsyth, 472 U.S. 511, 528 (1985) (officials are immune unless "the law clearly proscribed the actions they took").

In determining whether a particular right was clearly established at the time defendants acted, this Circuit has considered three factors: (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant or official would have understood that his or her acts were unlawful. Jermosen v. Smith, 945 F.2d 547, 550 (2d Cir. 1991). See Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir. 1989), citing Anderson, 483 U.S. at 640.

Recently, the Supreme Court has re-emphasized the need to look carefully at the "contours" of the right allegedly violated by a public official when undertaking the qualified immunity analysis. Saucier v. Katz, 533 U.S. 194 (2001). For example, there is no doubt that the case of Graham v. Connor, 490 U.S. 386 (1989), clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet, the Supreme Court has concluded that observation of that general principle is simply not enough when undertaking a qualified immunity analysis.

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court reiterated the need for a careful examination of the particular constitutional right alleged to have been violated when considering the defense of qualified immunity. Not only should the right itself be identified with a higher degree of specificity, the precise contours of the application of that more specific right to the facts at hand must be made by the district court reviewing a defense of qualified immunity. Saucier v. Katz, 533 U.S. 194 (2001) (emphasis added). The Saucier v. Katz Court reiterated the admonition from Anderson v. Creighton that:

> [t]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

Saucier v. Katz, 533 U.S. at 202.

Since the decision in Saucier v. Katz, the Supreme Court decided Hope v. Pelzer, 536 U.S. 730 (2002), providing additional guidance to litigants and courts examining the issues within and part of the defense of qualified immunity. In Hope v. Pelzer, 536 U.S. 730 (2002), the Supreme Court denied qualified immunity to three correctional officers who had handcuffed a prisoner to a "hitching post" as punishment for non-compliance with various orders and rules. The Supreme Court's decision reversed the Court of Appeals for the Eleventh Circuit which had affirmed the district court's grant of summary judgment based on qualified immunity to the three correction officers in question.

26

The Supreme Court in Hope rejected the Eleventh Circuit's rule that the test for the existence of a clearly established right that would allow a public official to understand the potential wrongfulness of his conduct should be evaluated in light of federal law that was "pre-existing, obvious and mandatory." See Hope, 536 U.S. at 734. While the Eleventh Circuit had agreed that the conduct itself was violative of the Eighth Amendment, the panel held the corrections officers were not on notice that such conduct was unlawful. The Eleventh Circuit held that prior cases should be "materially similar." Finding none, the Eleventh Circuit affirmed the district court's decision granting qualified immunity to the corrections officers.

In reversing the Court of Appeals for the Eleventh Circuit, the Supreme Court rejected the gloss placed on the Saucier v. Katz analysis for qualified immunity by that Circuit that there must be reported cases that are "materially similar" before a violation is found. In so holding, the Supreme Court adopted the "fair warning" standard found in United States v. Lanier, 520 U.S. 259 (1997) as an additional methodology to evaluate the second prong of the qualified immunity analysis.

In Lanier, the Supreme Court began its analysis with the understanding that in the situation of qualified immunity, "it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The Court reasoned that officers sued in a civil action for damages under 42 U.S.C. § 1983 should have the same right to fair notice as do defendants charged with the criminal offense defined in 18 U.S.C. § 242. In reviewing Section 242, the Court observed that it makes it a crime for a state official to act "willfully" and under color of law to deprive a person of rights protected by the Constitution. The Lanier Court held that the defendant was entitled to "fair warning" that his conduct deprived his victim of a constitutional right, and that the standard for determining the adequacy of that warning was the same as the standard for determining whether a constitutional right was "clearly established" in civil litigation under Section 1983.

27

In Lanier, the Eleventh Circuit had assumed (and held) that a criminal defendant should be held to a "substantially" higher standard of notice for the purposes of Section 242. In Lanier, the Supreme Court rejected this approach, and reasoned:

> This is not to say, of course, that the single warning standard points to a single level of specificity sufficient in every instance. In some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary. But general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.

Hope, 536 U.S. at 739-40 (internal citations omitted).

In sum, the Supreme Court in Hope rejected the "materially similar" gloss placed on a qualified immunity analysis as well as the notion that the absence of a reported case on point equates to a holding that qualified immunity applied in a given situation. In so holding, the Supreme Court emphasized the need for the detailed, searching and thorough analysis each and every time the defense based on the doctrine of qualified immunity is raised. The decision in Hope v. Pelzer is, in one sense, a continuation of the Supreme Court's admonition that the most important part of any qualified immunity decision is the examination of the constitutional right at issue and "the precise contours of the application of that more specific right to the facts at hand must be made." Saucier v. Katz, 533 U.S. 194, 202 (2001). In rejecting the "materially similar" standard espoused by the Eleventh Circuit, the Court has done nothing more than demand a high standard – not in pleading or proof – but in the continued, searching, and thorough, step-by-step examination of the defense of qualified immunity in the manner long-established by clear and unequivocal precedent.

In Hope, the Court held that the corrections officers were on notice that their conduct was clearly unlawful. Not long after the decision in Hope, the Second Circuit stated:

28

> Our analysis of a qualified immunity claim consists of a three step inquiry. See Wilson v. Layne, 526 U.S. 603, 609 (1999); X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 65-66 (2d Cir. 1999). First, we must determine whether plaintiff has alleged a violation of a constitutional right. Then we consider if the violated right was clearly established at the time of the conduct. See Saucier v. Katz, 533 U.S. 194, 201 (2001). Finally, if plaintiff had a clearly established, constitutionally protected right that was violated by the actions of the [defendants], he or she must demonstrate that defendants' actions were not objectively reasonable. X-Men, 196 F.3d at 66. This three step inquiry should typically be done in sequential order. Cty. of Sacramento v. Lewis, 523 U.S. 833, 842, n. 5 (1998).

Harhay v. Town of Ellington, et al., 323 F.3d 206, 211 (2d Cir. 2003).

This statement of the law succinctly captures just the sort of step-by-step, orderly methodology mandated by twenty years of Supreme Court precedent. Furthermore, this Court recognized that the failure to establish any one step of the analysis grants qualified immunity to the defendant in question.

> Defendants may benefit from qualified immunity if plaintiff is unable to establish any of these three steps. See X-Men, 196 F.3d at 65-66 ("These three issues should be approached in sequence, for if the second is resolved favorably to the official, the third becomes moot; a favorable resolution of the first moots both the second and the third."). Thus, if there is no deprivation of a constitutional right alleged by [the plaintiff] (the first step), there is no need for the court to decide if the right was clearly established at the time the [defendants] acted (the second step). See Saucier, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

Harhay v. Town of Ellington, et al., 323 F.3d 206, 211-2 (2d Cir. 2003).

Therefore, before applying the qualified immunity standard, the Court must ask whether there was a constitutional violation in the first instance. See Stuto v. Fleishman, 164 F.3d 820, 825 (2d Cir. 1999).

### 2.    **Plaintiffs' Claimed Constitutional Rights Are Not Clearly Established.**

Simply put, the vast majority of the claims advanced by the plaintiff are not clearly established as a matter of law. With regard to the claims based on the Second and Eighth Amendments, the discussion above demonstrates the rights, to the extent

29

that they are clearly established, are established in a manner opposite as claimed by the plaintiff. See discussion in Sections II.B, C, and D.

Also, the Fourth Amendment claims do not withstand scrutiny. Despite the plaintiff's protestation to the contrary, nothing in the warrant is false. The use of a so-called "ruse" is not contrary to the constitution. Police officers use reverse-sting operations all the time to arrest criminals. Once you examine the plaintiff's claims when they are tied to facts and circumstances, it is apparent that his claims fail.

### 3. The Actions of the Farmington Police Were Objectively Reasonable.

The defendants need only have arguable probable cause to enjoy the protections from the plaintiff's claims under the doctrine of qualified immunity because all of their actions were taken based on a warrant, which was signed by a neutral magistrate.

#### i. Arguable Probable Cause Existed To Support The Arrest And Search Warrants.

In essence, the plaintiff claims that neither the Arrest Warrant nor the Search Warrant was supported by probable cause. The plaintiff appears to have concluded the decision in State v. Walczyk, 76 Conn. App. 169, 818 A.2d 868 (2003), finding the magistrate's decision to sign the search warrant to be in error, is sufficient to both defeat qualified immunity and impose liability upon the individual defendants. Neither is the case.

First, there is nothing false in the warrant. The plaintiff cannot point to anything that is false and at his deposition, he confirmed all of the remaining facts. Plaintiff's only identification of a falsehood is that the affiants alleged a crime had taken place. That statement is a statement of law or the application of law to the facts. In his complaint, Plaintiff points to no other falsehoods, omissions, or anything else. It is undisputed that a neutral magistrate signed the warrant. Because the plaintiff has been silent on what should have been in the warrant or was incorrectly omitted, we examine the court's decision in State v Walczyk. Notably, the court's decision in Walczyk says nothing about the police's actions – only the magistrate. The Appellate Court observed:

30

- The warrant does not attempt to reconcile a construction of the "bloodbath" statement as a threat in the second subparagraph of paragraph 2 with the statement in the first subparagraph of what the defendant actually had said.

- The warrant does not state that any of the alleged earlier incidents of misconduct resulted in the defendant's conviction of threatening or of any other crime.

- The warrant does not distinguish between recent incidents and those that have become stale by passage of time.

- It does not represent that the defendant's possession of firearms was illegal.

- It does not indicate which of the specifically described firearms would likely be found in the defendant's residence and which would likely be found in his father's residence.

State v. Walczyk, 76 Conn. App. 169, 180-1, 818 A.2d 868 (2003)

Probable cause exists under federal law when "the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Lennon v. Miller, 66 F.3d 416, 424 (2d Cir. 1995). Likewise, under Connecticut law, probable cause "comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred." Reese v. Garcia, 115 F. Supp.2d 284, 290 (D. Conn. 2000). Whether probable cause existed is a question that maybe resolved as a matter of law on a motion for summary judgment if there is no dispute with regard to the pertinent events and knowledge of the officer. See Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). Therefore, to satisfy their burden and to establish that they had probable cause, defendants must demonstrate that in procuring plaintiff's arrest he had a quantum of evidence "more than rumor, suspicion, or even strong reason to suspect." United States v. Fisher, 702 F.2d 372, 375 (2d Cir. 1983). To establish probable cause, the evidence required does not have to support a conviction. See Id. The fact that Plaintiff was acquitted of a crime for which she was arrested does not mean that probable cause was

lacking. See Krause v. Bennett, 887 F.2d 362, 371 (2d Cir. 1989). Whether there was evidence to support a finding of probable cause depends on the totality of the circumstances and those facts available to the arresting officer at the time of the arrest. See Ill. v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); Lowth v. Town of Cheektowaga, 82 F.3d 563, 569 (2d Cir. 1996). In order to reconcile these issues, we employ was has come to be known as the corrected affidavit test. In civil rights cases involving the claim of false arrest or prosecution without probable cause, a court must "put aside allegedly false information, supply any omitted information, and determine whether the contents of the corrected affidavit would have supported a finding of probable cause." If at the conclusion of this analysis probable cause remains, no constitutional violation of plaintiff s Fourth Amendment rights has occurred. Probable cause only exists when there are "facts and circumstances sufficient to warrant a prudent man believing that the [suspect] had committed or was committing an offense." Lowth, 82 F.3d at 569.

**Importantly, probable cause is presumed when the arrest is made pursuant to a warrant issued by a neutral magistrate.** See Golino v. City of New Haven, 950 F.26 864, 870 (2d Cir. 1991). A plaintiff can overcome this heavy, but not insurmountable burden by demonstrating that his right not to be arrested without probable cause was violated when the officer submitting the probable cause affidavit "knowingly or intentionally, or with reckless disregard for the truth, made a false statement in his affidavit, or omitted material information, and that such false information was necessary to the finding of probable cause." Id.

With regard to the court's criticism that the warrants did not attempt to reconcile a construction of the "bloodbath" statement as a threat in the second subparagraph of paragraph 2 with the statement in the first subparagraph of what the defendant actually had said, the officers were left to rely on the report of Officer Hebert. None of the officers who prepared the affidavits witnessed the actual statement. The officers relied on the advice of the State's Attorney and the magistrate to evaluate any issues in this regard. State's Attorney O'Reilly concurred in the assessment of probable cause, as did the magistrate.

32

With regard to the court's criticism that the warrants did not state that any of the alleged earlier incidents of misconduct resulted in the defendant's conviction of threatening or of any other crime, adding in the information listed in the reports attached as Exhibits J-N, it reflects that the plaintiff plead guilty to several offenses by substitute information and many included breach of peace and the threatened use of a firearm. Moreover, the purpose of the search warrant was not to seize illegal firearms. Rather, the search warrant was to obtain the weapons to prevent the illegal use of those firearms. The police had no way to know whether the Walczyk's possession of firearms was illegal. Similarly, the police had no idea which of the specifically described firearms would likely be found in Walczyk's residence and which would likely be found in his father's residence. The police knew Walczyk used both addresses and would have access to weapons stored at his father's residence.

Finally, the arrest warrant was issued by a neutral magistrate, which in itself supports a finding of probable cause. Golino v. City of New Haven, 950 F.26 864, 870 (2d Cir. 1991). Probable cause is presumed, and arguable probable cause is all that is needed to fall within the protection of qualified immunity. Plaintiff has not overcome this presumption by making a substantial preliminary showing that Officer Brown, Corporal Deschanes or Sergeant Tyler, in their affidavits, knowingly and intentionally, or with reckless disregard for the truth, made a false statement that was necessary to the finding of probable cause. See Golino, 950 F.2d at 870. Indeed, no false statements are made in the warrants. Some information was omitted. When that information is returned to

Accordingly, Defendants' motion for summary judgment is granted on this claim.

### ii.    Use Of A So-Called "Ruse" To Arrest Walczyk At Police Headquarters Is Not Unconstitutional.

Walczyk expresses great concern that his constitutional rights were violated when Sergeant Jepsen telephoned him to come down to the Farmington Police Headquarters to "discuss" the land dispute as a pretext to arrest him outside of his home and to facilitate the search of his home. A ruse is not a violation of the Fourth Amendment.

In <u>Jenkins v. City of New York</u>, 1992 WL 147647 (S.D.N Y June 15, 1992), the police, investigating the theft of cable converter boxes and lacking a warrant or probable cause to arrest the suspect, lied to him, telling him that they were investigating an unrelated car accident, in order to bring him to the station to participate in a line-up. <u>Id.</u> at *8. Judge Carter stated that "there is no constitutional guarantee that a person will not be subject to a sting operation or be lured to a public place for the purpose of arrest." <u>Id</u>. (*citing* <u>United States v. Leung</u>, 929 F.2d 1204, 1208 (7th Cir. 1991) (ruse used to gain entry to hotel room did not offend constitution)).

While Connecticut state law is silent on this issue, New York law also does not find the use of a ruse to amount to a seizure or false arrest. *See, e.g.,* <u>People v. Coppin</u>, 202 A.D.2d 279, 608 N.Y.S.2d 661, 662 (1st Dep't 1994) (female officer arrested defendant in hallway after she "knocked on his door and suggested that she might want to go out with him"); <u>People v. Damiano</u>, 209 A.D.2d 873, 619 N.Y.S.2d 214, 215 (3rd Dep't 1994) (investigators told defendant that they wanted him to try to make an identification from a photographic array regarding an assault in which he was the complainant); <u>People v. Roe</u>, 136 A.D.2d 140, 525 N.Y.S.2d 966, 967-68 (3rd Dep't 1988) (plainclothes officer lured defendant from home on pretext that she had encountered car trouble).

Accordingly, Defendants' motion for summary judgment is granted on this claim.

### iii.   *Seizing Additional Items Not Described In The Search Warrant Was Not Violative Of The Fourth Amendment.*

"The reasonableness requirement of the Fourth Amendment applies not only to prevent searches and seizures that would be unreasonable if conducted at all, but also to ensure reasonableness in the manner and scope of searches and seizures that are carried out, whether pursuant to a warrant or under `exigent circumstances.'" <u>Ayeni v. Mottola</u>, 35 F.3d 680, 684 (2d Cir. 1994) (*citing* <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989) and <u>Tennessee v. Garner</u>, 471 U.S. 1, 7-8 (1985)). "Law enforcement officers conducting searches under a warrant are limited in their conduct to either (a) actions expressly authorized by the warrant, or (b) such further actions as are impliedly

34

authorized because they are reasonably related to accomplishing the search authorized by the warrant or accomplishing additional legitimate law enforcement objectives, such as insuring the safety of the searching officers and effectively responding as law enforcement officers to circumstances that might arise during the course of the search." Id. at 685 (footnotes omitted).

The plain view doctrine provides that "the police may seize evidence in plain view without a warrant in certain limited cases. The Supreme Court has set forth three conditions that must be met before the plain view doctrine may be applied. First, the initial police intrusion must be lawful, such as where the police have a warrant to search a given area for specified objects, and in the course of the search discover other incriminating articles[;] . . . Second, the discovery of evidence in plain view must be inadvertent[;] [unless the objects seized are contraband, stolen or dangerous in themselves. See Coolidge v. New Hampshire, 403 U.S. 443, 471 (1971)] . . . [;] Third, it must be 'immediately apparent to the police that they have evidence before them' . . . ." (Citations omitted.) United States v. Bonfiglio, 713 F.2d 932 (2nd Cir. 1983).

Here, all three conditions were present. The officers were present under the auspicious of a lawful search warrant. The items found that were not described in the warrant – magazines, ammunition and the like, were found inadvertently during the course of the search in plain view and some of these items were dangerous in themselves (ammunition). Not only did the officers telephone State's Attorney Brodsky to inquire whether they should take the items not specifically described in the warrant, Captain Rio spoke with State's Attorney John O'Reilly regarding his opinion of probable cause for the arrest and search warrants and Attorney O'Reilly agreed that probable cause existed to obtain arrest and search warrants based on the events contained in Officer Hebert's report. L.R. 56 Stmt., ¶21.

"[A]s a practical matter, police officers must be able to rely on the advice of prosecutors. The judicial system depends upon this reliance." Dale v. Kelley, 908 F. Supp. 125, 138 (W.D.N.Y 1995) (concluding that village police chief's reliance on district attorney's "relatively more expert opinion that probable cause existed was objectively

involvement of defendants in alleged constitutional deprivations is required under section 1983 and may be established by evidence that the defendant "(i) personally participated in the alleged constitutional violation, (ii) was grossly negligent in supervising subordinates who committed the wrongful acts, or (iii) exhibited deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring". Provost v. City of Newburgh et al., 262 F.3d 146, 154 (2d Cir. 2001). The "affirmative link" requirement contemplates proof that the supervisor's conduct led inexorably to the constitutional violation. Fraire v. City of Arlington, 957 F.2d 1268, 1281 (5th Cir.).

Taking each element in turn, it is undisputed that Captain Rio did not execute the affidavits in support of the warrants. It is equally undisputed that Captain Rio was not present at Tunxis Street during the search and he had no part in that search. The plaintiff had not adduced any evidence that Captain Rio was "grossly negligent." Plaintiff has not disclosed an expert to establish the relevant standard of care. Additionally, it cannot be said that Captain Rio knew, to a moral certainty, that a constitutional violation would occur by his subordinates and that he consciously disregarded the risk. The plaintiff has not adduced any evidence that would demonstrate Captain Rio's deliberate indifference to Walczyk's constitutional rights.

Therefore, no supervisory liability should attach and summary judgment should be granted in favor of Captain Rio on the supervisory liability claim.

### v. In Addition And In The Alternative, Plaintiff's Remaining Federal Constitutional Claims Are Barred By The Doctrine Of Qualified Immunity.

To the extent that the Court does not conclude that the plaintiff fails to state a claim upon which relief may be granted based on the Second, Eighth, and Fourteenth Amendments and to the extent the plaintiff's Eighth Amendment claim is not barred by absolute immunity, plaintiff's federal constitutional are barred by the doctrine of qualified immunity.

As a threshold matter, the discussion above concerning the defendants' argument that the plaintiff fails to state claims based on the Second, Eighth and

reasonable as a matter of law"); see also Williams v. Fedor, 69 F. Supp.2d 649, 677-78 (M.D.Pa. 1999) (under objective-reasonableness standard, officers could rely upon district attorney's advice and believe that they were not violating plaintiff's rights by proceeding with perjury prosecution); East Coast Novelty Co. v. City of New York, 781 F. Supp. 999, 1011 (S.D.N.Y. 1992) (because she was entitled to rely on advice of counsel in drafting and executing warrant and she did not exceed that advice, officer was entitled to qualified immunity).

Because the officers relied on the prosecutor's advice in seizing the additional items, the officers are protected by qualified immunity.

### iv. Plaintiff's Supervisor Liability Claim Against Captain Rio Is Barred By The Doctrine Of Qualified Immunity.

Plaintiff also alleges that Captain Rio is liable in his capacity as a supervisor of the other Farmington Officers. Without elaboration, the plaintiff makes conclusory allegations that Captain Rio is liable for the actions of his subordinates. As a threshold matter, since there is no violation of the constitution, there can be no supervisory liability on the part of Captain Rio. Additionally, this Circuit holds that the plaintiff must show that both laws were clearly established to lay the predicate for demonstrating that the supervisor lacks qualified immunity: the law violated by the subordinate officers and the supervisory liability doctrine under which he wishes to hold the supervisor liable. Poe v. Leonard, 282 F.3d 123, 134 (2d Cir. 2002). A supervisor may not be held liable unless both legal theories were clearly established. Poe v. Leonard, 282 F.3d 123, 134 (2d Cir. 2002).; citing Camilo-Robles v. Hoyos, 151 F.3d 1, 6 (1st Cir. 1998), cert. denied, 525 U.S. 1105 (1999); Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 454 (5th Cir.), cert. denied sub nom. Lankford v. Doe, 513 U.S. 815 (1994); Shaw v. Stroud, 13 F.3d 791, 801 (4th Cir.), cert. denied, 513 U.S. 813 (1994) and 513 U.S. 814 (1994).

Additionally, the plaintiff overlooks that a supervisor may not be held liable under Section 1983 "merely because his subordinate committed a constitutional tort." Poe v. Leonard, 282 F.3d at 140. The plaintiff must demonstrate "an affirmative causal link between the supervisor's inaction and [his] injury." Poe, 282 F.3d at 140. Personal

36

Fourteenth Amendments demonstrates that the rights claimed by the plaintiff are not clearly established. Indeed, the weight of authority demonstrates that the rights claimed are clearly established in a manner exactly opposite to the manner claimed by the plaintiff. If the right is not clearly established, no constitutional violation could occur. Harhay v. Town of Ellington, et al., 323 F.3d 206, 211-2 (2d Cir. 2003).

Therefore, the plaintiff's federal claims are barred by the doctrine of qualified immunity and summary judgment should enter in favor of all defendants.

### G. THE ALLEGATIONS OF THE PLAINTIFF'S COMPLAINT DO NOT AMOUNT TO A VIOLATION OF THE CONNECTICUT CONSTITUTION, ARTICLE FIRST, SECTIONS 4, 5, 7, 9, 14 AND 15 AS A MATTER OF LAW.

Thomas Walczyk has also claimed that all defendants violated the Connecticut Constitution, Article First, sections 4, 5, 6, 7, 9, 14 and 15. Unfortunately, the plaintiff's state constitutional claims fail as a matter of law. No private right of action for damages exists under Article First, sections 4, 5, 6, 14, and 15. The Supreme Court of the State of Connecticut has only recognized a claim for damages under Article First, Sections 7 and 9. Even then, a claim for damages under Article First, Sections 7 and 9, has only been recognized on a case-by-case basis and where no other remedy exists.

#### 1. Claims Arising From The Connecticut Constitution.

The Connecticut Supreme Court has been reluctant to create private causes of action for money damages under the Connecticut Constitution. See ATC Partnership v. Town of Windham, 251 Conn. 597 (1999) (declining to recognize a cause of action for alleged violation of substantive due process rights under article first §8); Kelly Property Development, Inc. v. Lebanon, 226 Conn. 314 (1993) (same). To date, such a cause of action has been created in only one specific set of circumstance with respect to Article First, Sections 7 and 9 of the state constitution. In Binette v. Sabo, 244 Conn. 23 (1998), the Connecticut Supreme Court recognized the availability of a state Bivens-type action based on the Connecticut Constitution.

In Binette, the Connecticut Supreme Court cautioned:

> [W]e emphasize that our decision to recognize a *Bivens*-type remedy in this case does not mean that a constitutional cause of action exists for every violation of our state constitution . . . Whether to recognize a cause of action for alleged violations of other state constitutional provisions in the future must be determined on a case-by-case basis.

Binette v. Sabo, 244 Conn. at 47-8 (citations omitted).

The Connecticut Supreme Court, however, was clear in Binette that they did not purport to announce an overarching universal principle. Binette v. Sabo, 244 Conn. at 47. The court expressly cautioned that the availability of access to a separate tort action under Binette should be analyzed on a case-by-case basis only, a caution duly repeated. Id. at 48; *see also* ATC Partnership v. Windham, 251 Conn. 597, 613, 741 A.2d 305 (1999), *cert. denied*, 530 U.S. 1214 (2000).

The facts in Binette which led to the Court's willingness to recognize a cause of action for money damages under Article First, §§ 7 & 9, are not present in this case. In Binette, the defendants, a municipal police chief and one of his officers, allegedly entered the plaintiffs' home without permission or a warrant. 244 Conn. at 26. The police chief allegedly threatened the wife with arrest and imprisonment and pushed her into a wall and over a table. Id. Then outside the home, the chief allegedly slammed the husband's head repeatedly against a car, and the other officer then struck the husband in the head and kicked him while he was on the ground experiencing an epileptic seizure. Id. The court expressly recognized the extraordinary nature of the cause of action created in Binette. Binette recognized that a warrant-less home invasion by police officers coupled with physical assaults and threats violated the state constitution. Because of the case-by-case nature of the claim, the court was careful to delineate a multi-factor analysis for the determination whether a cause of action exists under a specific set of facts. In Bindette, the court held the multi-factor analysis to include:

> the nature of the constitutional provision at issue; the nature of the purported unconstitutional conduct; the nature of the harm; separation of powers considerations and the other factors articulated in Bivens and its progeny; the concerns expressed in Kelley Property Development, Inc.; and any other pertinent factors brought to light by future litigation.

Binette v. Sabo, 244 Conn at 47-8.

39

The facts as alleged by Thomas Walczyk, when examined by the court's multi-factor analysis, do not rise to the level of conduct found violative of the state constitution in <u>Binette</u>. Consider the events here: Farmington police officers investigated what they thought to be a crime. They applied for warrants which were later signed by a neutral magistrate. When executing the warrants, the officers took steps to minimize disruption to everyone involved and took steps to insure the safety of all involved. There is no allegation or evidence of the use of force or threats. From that point, the state criminal justice system took its course. Even reading the plaintiff's complaint generously, there are no allegations, nor is there any evidence that rise to the level of the facts of <u>Binette</u>. This is nothing like the defendants in Binette, who entered the plaintiffs' home without permission or a warrant, threatened the wife with arrest and imprisonment and pushed her into a wall and over a table. The distinguishing characteristics of <u>Binette</u>, physical force, violence and death threats, have no analog in the facts of the present case.

Accordingly, this Court should carefully consider the direction of the Connecticut Supreme Court in <u>Binette</u>. The Connecticut Supreme Court did not purport to announce an overarching universal principle. <u>Binette v. Sabo</u>, 244 Conn. at 47. The Court expressly cautioned that the availability of access to a separate tort action under <u>Binette</u> should be analyzed on a case-by-case basis only, a caution duly repeated. Therefore, summary judgment should enter in favor of the defendants on the state constitutional claims as a matter of law.

### 2. **The Individual Officers Are Protected by Qualified Immunity.**

As discussed in Section II.H, the defendants argue that no cause of action exists under the Connecticut Constitution for the plaintiff's claims arising under Article First, Sections 7 and 9 when evaluated by the governing law – <u>Binette v. Sabo</u>, 244 Conn. 23 (1998). Moreover, no private right of action for damages exists under Article First, Sections 4, 5, 14 and 15. Should this Court take the extraordinary step and conclude that such an action does exist under these particular facts and circumstances -- either under Article First, Sections 7 and 9 and/or under Article First, Sections 4, 5, 14 and 15, this Court should simultaneously recognize a state constitutional doctrine of qualified

40

If the Connecticut Supreme Court looks to federal precedent for analogous provisions in federal law for its state constitutional interpretation, the only consistent interpretation is that the state constitutional causes of action may be properly interposed by a state qualified immunity defense. Thus, if we conclude that a state doctrine of qualified immunity exists to these state constitutional claims, it only makes sense that we look to federal precedent to ascertain the relevant test. The defendants incorporate their argument set forth in Section II.F. Accordingly, as the officers were acting in an objectively reasonable manner, they are protected from state constitutional liability as a matter of law. Summary judgment is appropriate on the plaintiff's state constitutional claims.

### H.  ALTERNATIVELY, THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION OVER THE STATE LAW CLAIMS.

In addition and the alternative, this Court, having decided that the plaintiff has failed to state valid federal claims or that defendants are protected by qualified immunity and/or granted summary judgment on all federal claims, should decline to exercise jurisdiction over the pendant state law claims, including the state constitutional claims. See United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in the jurisdictional sense, the state claims should be dismissed as well."); Lennon v. Miller, 66 F.3d 416, 426 (2d Cir. 1995) (same).

Accordingly, the Court should decline to extend its jurisdiction over the claims based on the Connecticut Constitution.

### III.  CONCLUSION.

For the reasons set forth above, the defendants, JAMES RIO, BRIAN KILLIANY, JAMES JEPSEN, WILLIAM TYLER, ANGELA DESCHENES and SHAWN BROWN pray that their motion for summary judgment is granted as to the claims of Thomas Walczyk.

immunity complementary to the federal doctrine of qualified immunity, informed by the existing state governmental jurisprudence. The recognition of a state constitutional doctrine of qualified immunity is consistent with the Supreme Court's examination of a state constitutional cause of action in Binette v. Sabo. While unarticulated in current Connecticut jurisprudence, there exists a state law analog to the federal doctrine of qualified immunity as a defense to claims which arise under Article First, sections 7 and 9 of the Connecticut Constitution. This interpretation makes sense for the reasons that follow.

The Supreme Court of Connecticut has only recently recognized the existence of a cause of action under Article First, Sections 7 and 9 under very few specific sets of facts. Binette v. Sabo, 244 Conn. 23, 710 A.2d 688 (1998). The Supreme Court has explicitly stated that this cause of action arises on a fact-specific basis. Importantly, the Court has often looked to federal case law interpreting the Federal Constitution when examining its own Constitution. In fact, the Connecticut Supreme Court analogized the constitutional tort action arising under Article First, sections 7 and 9, to the that action described by the United States Supreme Court in Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 390-7, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); Binette v. Sabo, 244 Conn. 23, 45-48, 710 A.2d 688 (1998); see ATC Partnership v. Town of Windham, 251 Conn. 597, 741 A.2d 305, n. 16 (1999); see also Martin v. Brady, 63 Conn. App. 433, cert. granted, 258 Conn. 919 (2001).

It only makes sense that the state constitutional claim should come with a defense akin to federal qualified immunity jurisprudence. Qualified immunity extends to government officials performing discretionary functions. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It has been said that the doctrine strikes a balance:

> between the need, on one hand, to hold responsible public officials exercising their power in a wholly unjustified manner and, on the other hand, to shield officials responsibly attempting to perform their public duties in good faith from having to explain their actions to the satisfaction of a jury.

Kaminsky v. Rosenblum, 929 F.2d 922, 924-25 (2d Cir. 1991) citing Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949).

41

RESPECTFULLY SUBMITTED,

THE DEFENDANTS,
JAMES RIO, BRIAN KILLIANY, JAMES JEPSEN, WILLIAM TYLER, ANGELA DESCHENES and SHAWN BROWN

/s/ John J. Radshaw, III
Thomas R. Gerarde, ct05640
John J. Radshaw, III, ct19882
HOWD & LUDORF
65 Wethersfield Avenue
Hartford, CT 06114
(860) 249-1361
(860) 249-7665 (fax)

## CERTIFICATION

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the following counsel of record this 2nd day of February 2004.

Jon L. Schoenhorn, Esquire
Jon L. Schoenhorn & Associates
97 Oak Street
Hartford, CT 06106

/s/ John J. Radshaw, III
John J. Radshaw, III

43