**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| THOMAS WALCZYK, ET AL | : | NO.:  3:02 CV 1536 (RNC) |
| | : | |
| v. | : | |
| | : | |
| JAMES RIO, ET AL | : | March 24, 2004 |

## DEFENDANTS' LOCAL RULE 56(a)2 STATEMENT

The defendants, JAMES RIO, BRIAN KILLIANY, JAMES JEPSEN, WILLIAM TYLER, ANGELA DESCHENES and SHAWN BROWN, submit the following statement in response to the plaintiff's Local Rule 56(a)1 statement dated February 2, 2004.

1.     Admitted.

2.     Admitted.

3.     Admitted.

4.     So much of paragraph 4 that alleges that Thomas Walczyk and his parents have been involved in disputes with the Barberino Realty and Development Corporation is admitted; the remaining allegations of paragraph 4 that insinuate that the disputes are the same, were exercised by Thomas, Elizabeth and Lucien in concert or that these disputes relate to the same parcel or parcels of land is denied.  **Def. L.R. 56(a)1 Statement, ¶¶2-4, 37, Attachment 2, Depo. Thomas Walczyk; Attachment 3, Map.**

5.     So much of paragraph 5 that alleges that Thomas Walczyk and his parents have been involved in disputes with the Barberino Realty and Development Corporation and that these disputes have covered issues concerning quiet title and ownership rights is admitted; the remaining allegations of paragraph 5 that insinuate that the disputes are the same, were exercised by Thomas, Elizabeth and Lucien in concert or that these disputes relate to the same parcel or parcels of land is denied. **Def. L.R.**

**56(a)1 Statement, ¶¶2-4, 37, Attachment 2, Depo. Thomas Walczyk; Attachment 3, Map.**

6.   So much of paragraph 6 that alleges that Lucian and Elizabeth executed a stipulation is admitted; the remaining allegations of paragraph 6 that insinuate that that this stipulation covered the dispute occasioned by Thomas, the land claimed by Thomas is denied. **Def. L.R. 56(a)1 Statement, ¶¶2-4, 37, Attachment 2, Depo. Thomas Walczyk; Attachment 3, Map.**

7.   So much of paragraph 7 that alleges that Thomas, at one time, exercised rights derivative of his parents' rights secured by the stipulation; the remaining allegations of paragraph 7 that insinuate Thomas was acting under his parents' rights with regard to his separate claim and that said stipulation relates to the land adjacent to Thomas' property is denied. **Def. L.R. 56(a)1 Statement, ¶¶2-4, 37, Attachment 2, Depo. Thomas Walczyk; Attachment 3, Map.**

8.   Admitted.

9.   It is admitted that Thomas Walczyk called the Farmington Police Department on August 30, 1999 to report that a locked gate with a "no trespassing sign" had been knocked down at the end of Tunxis Street and a logging skidder was parked on property south of 28 Tunxis Street that Walczyk claimed to own but that land had been adjudged to belong to Barberino Realty & Development Corporation by the Connecticut Superior Court and that Thomas Walczyk had no right, title or interest to that property. **Def. L.R. 56(a)1 Statement, ¶¶2-4, 37, Attachment 2, Depo. Thomas Walczyk; Attachment 3, Map.**

10.   Admitted.

11.   Admitted.

12.   Admitted.

13.    So much of paragraph 13 that states "for the reasons previously stated" is denied; the remaining allegations are admitted.

14.    So much of paragraph 14 that says "while trying to impress upon Officer Hebert the importance of enforcing the law" is denied; the remaining allegations are admitted. **Pl. Ex. B. Attachment 1, Def. Response to Plaintiff's Request for Admissions, ¶6 and responses.**

15.    It is admitted that on August 30, 1999, Officer Hebert exercised the discretion afforded to him as a duly appointed police officer employed by the Town of Farmington and chose not to arrest Walczyk at that time. **Def. Exhibit T, Trial Transcript, 56. Attachment 1, Def. Response to Plaintiff's Request for Admissions, ¶5-8 and responses.**

16.    Admitted.

17.    It is admitted that Officer Hebert did not see Thomas Walczyk in possession of a firearm on August 30, 1999. It is further admitted that Officer Hebert did not hear Thomas Walczyk mention a firearm during their conversation on August 30, 1999 other than the reference to a potential "bloodbath." **Def. L.R. Statement ¶16; Attachment 1, Def. Response to Plaintiff's Request for Admissions, ¶10 and response.**

18.    So much of paragraph 18 that alleges that Tyler, Rio, and Deschenes believed on or before September 4, 1999 that Officer Hebert believed no crime had been committed is denied; the remaining allegations are admitted. **Def. Exhibit T, Trial Testimony of Officer Hebert 26, 29, 46, 56; Def. L.R. 56(a)1 Statement, 20, 26, 28,**

19.    Admitted.

20.    Admitted.

21.    Admitted.

22.    Admitted.

23.   Admitted, but irrelevant and immaterial.

24.   Admitted, but irrelevant and immaterial.

25.   Admitted.

26.   Admitted.

27.   It is admitted that Sergeant Jepsen telephoned Thomas Walczyk on September 7, 1999 to invite him to come to Farmington Police Department Headquarters to discuss the property dispute Walczyk had with Barberino Realty. It is further admitted that Thomas Walczyk was arrested on the September 4, 1999 arrest warrant when he arrived at the Farmington Police Department following Sergeant Jepsen's telephone call. **Def. L.R. 56(a)1 Statement, ¶37; Attachment 1, Def. Response to Plaintiff's Request for Admissions, ¶15 and response.**

28.   Denied; **Def. L.R. 56(a)1 Statement, ¶¶32-34.**

29.   So much of paragraph 29 that alleges that Thomas was arrested and detained upon his arrival at Farmington Police Headquarters is admitted; the remaining allegations are denied. **Def. L.R. 56(a)1 Statement, ¶¶23, 38, 39.**

30.   Admitted, but irrelevant and immaterial.

31.   Admitted.

32.   Admitted.

33.   Denied; **Pl. Ex. Q, p. 22-24; Def. L.R. 56(a)1 Statement, ¶43.**

34.   Denied; **Pl. Ex. Q, p.29; Def. L.R. 56(a)1 Statement, ¶43.**

35.   So much of paragraph 35 that alleges that the weapons at Thomas' home were not in violation of any other laws is denied; the remaining allegations are admitted. **Pl. L.R. 56(a)1 Statement, ¶39 and Def. Response.**

36.   So much of paragraph 36 that alleges either Elizabeth or Lucien protested or voiced protestations is denied; the remaining allegations are admitted

as to Lucien, only. **Def. L.R. 56(a)1 Statement ¶45; Def. Exhibit D, pp.34-35.**

37. Admitted.

38. Admitted.

39. Admitted.

40. Admitted, but irrelevant and immaterial.

41. Admitted, but irrelevant and immaterial.

42. Denied; **Def. L.R. 56(a)1 Statement, ¶¶28-30; Pl. L.R. 56(a)1 Statement, ¶¶19-20 and responses.**

43. Denied; **Def. L.R. 56(a)1 Statement, ¶¶8-15.**

44. Admitted, but irrelevant and immaterial.

45. Admitted, but irrelevant and immaterial.

46. Admitted.

47. Admitted.

48. Admitted.

49. Admitted.

50. Admitted.

51. Admitted.

RESPECTFULLY SUBMITTED,

THE DEFENDANTS,
JAMES RIO, BRIAN KILLIANY, JAMES
JEPSEN, WILLIAM TYLER, ANGELA
DESCHENES and SHAWN BROWN


/s/ John J. Radshaw, III
John J. Radshaw, III, ct19882
HOWD & LUDORF
65 Wethersfield Avenue
Hartford, CT  06114
(860) 249-1361
(860) 249-7665 (fax)


## CERTIFICATION

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the following counsel of record this 24th day of March 2004.

Jon L. Schoenhorn, Esquire
Jon L. Schoenhorn & Associates
97 Oak Street
Hartford, CT  06106


/s/ John J. Radshaw, III
John J. Radshaw, III

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THOMAS WALCZYK, ET AL | : | NO.: 3:02CV1537 (RNC) |
| | : | |
| v. | : | |
| | : | |
| JAMES RIO, ET AL | : | SEPTEMBER 4, 2003 |

## DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFF'S REQUEST FOR ADMISSIONS DATED AUGUST 5, 2003

Pursuant to Fed. R. Civ. P. 36, the defendants, JAMES RIO, BRIAN KILLIANY, JAMES JEPSEN, WILLIAM TYLER, ANGELA DESCHENES and SHAWN BROWN hereby responds and objects to plaintiffs' Requests for admissions dated August 5, 2003, as follows:

1.     In August 1999, the plaintiff, Thomas Walczyk, lived with his wife, the plaintiff, Maximina Walczyk, and their four children ages 19, 14, 11 and 8, in a single-family home located at 28 Tunxis Street, Farmington.

**RESPONSE**:

It is admitted that Thomas Walczyk, Maximina Walczyk, and their four children lived in a single-family home located at 28 Tunxis Street, Farmington, CT during August 1999. As to the remaining allegations of paragraph 1, the defendant, after a good faith investigation, does not have sufficient information to admit or deny said paragraph.

2.     In September, 1999, the plaintiff, Elizabeth Walczyk resided in a single-family home located at 27 Tunxis Street, Farmington, with her late husband Lucian Walczyk.

**RESPONSE**:

It is admitted that Elizabeth and Lucian Walczyk resided in a single-family

## Attachment 1

home located at 27 Tunxis Street, Farmington and it is further admitted that Lucian Walczyk died sometime after September 1999.

3.    On August 30, 1999, the plaintiff, Thomas Walczyk, noticed that a locked gate with a "no trespassing sign" on his land had been knocked down and a logging skidder was parked on the property.

**RESPONSE**:

It is admitted that on August 30, 1999, Thomas Walczyk noticed that a locked gate with a "no trespassing sign" had been knocked down at the end of Tunxis Street and a logging skidder was parked on property south of 28 Tunxis Street that Walczyk claimed to own but that land had been adjudged to belong to Barberino Realty & Development Corporation by the Connecticut Superior Court and that Thomas Walczyk had no right, title or interest to that property.

4.    On August 30, 1999, plaintiff Thomas Walczyk called the Farmington Police Department to report the incident.

**RESPONSE**:

It is admitted that Thomas Walczyk called the Farmington Police Department on August 30, 1999 to report that a locked gate with a "no trespassing sign" had been knocked down at the end of Tunxis Street and a logging skidder was parked on property south of 28 Tunxis Street that Walczyk claimed to own but that land had been adjudged to belong to Barberino Realty & Development Corporation by the Connecticut Superior Court and that Thomas Walczyk had no right, title or interest to that property.

5.    On August 30, 1999, Officer David Hebert of the Farmington Police Department arrived at 28 Tunxis Street, Farmington.

**RESPONSE**:

It is admitted that Officer Hebert was dispatched to investigate Thomas

Walczyk's complaint that a locked gate with a "no trespassing sign" had been knocked down at the end of Tunxis Street and a logging skidder was parked on property south of 28 Tunxis Street that Walczyk claimed to own but that land was adjudged to belong to Barberino Realty & Development Corporation by the Connecticut Superior Court and that Thomas Walczyk had no right, title or interest to that property.

6.    At some point during a conversation on August 30, 1999, between Officer Hebert and Plaintiff Thomas Walczyk, Walczyk asked whether the police would be responsible if a "bloodbath" ensued from their failure to uphold the law of trespass.

**RESPONSE**:

It is admitted that Officer Hebert wrote in his report dated August 30, 1999 that Thomas Walczyk told Hebert that "the police were not taking the action needed to avoid a 'bloodbath.'" It is further admitted that Officer Hebert's report is attached to the plaintiffs' Requests for Admission dated August 5, 2003 as Exhibit A.

7.    On August 30, 1999, Officer Hebert did not arrest Thomas Walczyk because he did not believe the plaintiff committed a crime.

**RESPONSE**:

It is admitted that on August 30, 1999, Officer Hebert exercised the discretion afforded to him as a duly appointed police officer employed by the Town of Farmington and chose not to arrest Walczyk at that time.

8.    The report attached as Exhibit A is a true and accurate copy of the report filed by Officer Hebert as a result of his encounter with Thomas Walczyk on August 30, 1999.

**RESPONSE**:

It is admitted that the document attached as Exhibit A to the plaintiffs'

Request for Admissions dated August 5, 2003 is a true and accurate copy of the report filed by Officer Hebert as a result of his dispatch and investigation of Thomas Walczyk's complaint on August 30, 1999.

9.     Defendant Rio read Exhibit A between August 30, 1999 and September 4, 1999.

**RESPONSE**:

It is admitted that Captain James Rio read Exhibit A between August 30, 1999 and September 4, 1999.

10.     During Officer Hebert's conversation with Thomas Walczyk, on August 30, 1999, said Walczyk did not display, indicate, or mention a firearm.

**RESPONSE**:

It is admitted that Officer Hebert did not see Thomas Walczyk in possession of a firearm on August 30, 1999. It is further admitted that Officer Hebert did not hear Thomas Walczyk mention a firearm during their conversation on August 30, 1999 other than the reference to a potential "bloodbath."

11.     On September 4, 1999, an arrest warrant was issued for the plaintiff, Thomas Walczyk, based upon an affidavit prepared and signed by defendant William Tyler.

**RESPONSE**:

It is admitted that on September 4, 1999, an arrest warrant on the charge of Threatening, a violation of Conn. Gen. Stat. §53a-62, was issued by a Judge of the Connecticut Superior Court for Thomas Walczyk upon an affidavit signed by Sergeant William Tyler and prepared by Sergeant Tyler and other officers of the Farmington Police Department.

12.     On September 4, 1999, a search warrant seeking firearms was issued for 27 and 28 Tunxis Street in Farmington, based upon an affidavit prepared and

signed by defendants Angela Deschenes and Shawn Brown.

**RESPONSE**:

It is admitted that on September 4, 1999, a search warrant seeking firearms was issued for 27 and 28 Tunxis Street in Farmington by a Judge of the Superior Court, based upon an affidavit signed by Corporal Angela Deschenes and Officer Shawn Brown and prepared by Sergeant Tyler and other officers of the Farmington Police Department.

13.    Thomas Walczyk was arrested on the September 4, 1999 warrant at the Farmington Police Department on September 7, 1999.

**RESPONSE**:

It is admitted that Thomas Walczyk was arrested on the September 4, 1999 arrest warrant when he arrived at the Farmington Police Department.

14.    Thomas Walczyk was arrested on the September 4, 1999, warrant at the Farmington Police Department on September 7, 1999.

**RESPONSE**:

It is admitted that Thomas Walczyk was arrested on the September 4, 1999 arrest warrant when he arrived at the Farmington Police Department.

15.    On September 7, 1999, Defendant Rio accomplished service of the arrest warrant by ruse by telephoning Thomas Walczyk and inviting him to come to the station to discuss a property dispute he had with his neighbor.

**RESPONSE**:

It is admitted that Sergeant Jepsen telephoned Thomas Walczyk on September 7, 1999 to invite him to come to Farmington Police Department Headquarters to discuss the property dispute Walczyk had with Barberino Realty. It is further admitted that Thomas Walczyk was arrested on the September 4, 1999 arrest warrant when he arrived at the Farmington Police Department following

Sergeant Jepsen's telephone call.

16.    When Thomas Walczyk, arrived at police headquarters on September 7, 1999, Defendant Tyler placed him under arrest and removed him to the cellblock.

**RESPONSE**:

It is admitted that on September 7, 1999, Thomas Walczyk was arrested when he arrived at Farmington Police Headquarters. It is further admitted that Thomas Walczyk was processed and then placed in the Department's detention area.

17.    The defendants were all sworn officers of the Farmington Police Department between August 30, 1999, and September 7, 1999, and were acting under color of law.

**RESPONSE**:

It is admitted that Captain James Rio, Detective Brian Killiany, Sergeant James Jepsen, Sergeant William Tyler, Corporal Angela Deschenes and Officer Shawn Brown were police officers employed by the Town of Farmington and acting under the authority granted to them by the Town of Farmington and the State of Connecticut.

18.    As Plaintiff Thomas Walczyk was being arrested, officers from both the Farmington and West Hartford Police Departments executed a single search warrant for firearms at the premises located at 27 and 28 Tunxis Street.

**RESPONSE**:

It is admitted that after Thomas Walczyk was in the custody of the Farmington Police Department, officers of the Farmington Police Department with the assistance of officers of the West Hartford Police Department, executed a search warrant for firearms at the premises located at 27 Tunxis Street and then at the

premises located at 28 Tunxis Street.

19.     On September 7, 1999, at 27 Tunxis Street, Plaintiff Elizabeth Walczyk's home, the police seized six handguns, nine rifles, three shotguns and one gun case.

**RESPONSE**:

It is admitted that the items seized from 27 Tunxis Street on September 7, 1999 are listed on Exhibit A attached hereto.

20.     The six handguns, nine rifles and three shotguns seized from 27 Tunxis Street on September 7, 1999 were unloaded.

**RESPONSE**:

It is admitted at the time the firearms listed on Exhibit B attached hereto were seized from 27 Tunxis Street on September 7, 1999, those firearms were unloaded.

21.     At 28 Tunxis Street, Plaintiff Thomas Walczyk's home, on September 7, 1999, the police seized 22 handguns, 27 sporting rifles, three assault-type rifles and seven shotguns.

**RESPONSE**:

It is admitted that the items seized from 28 Tunxis Street on September 7, 1999 are listed on Exhibit B attached hereto.

22.     The 22 handguns, 27 sporting rifles, three assault-type rifles and seven shotguns seized from 28 Tunxis Street on September 7, 1999, were all lawfully in the plaintiff's possession and were registered in his name.

**RESPONSE**:

**OBJECTION**. The defendant objects to so much of paragraph 22 that alleges the firearms at 28 Tunxis Street were lawfully in the possession of Thomas Walczyk. Such a claim is a conclusion of law that is not properly the subjection of a

7

Request for Admission under Fed.R.Civ.P. 36.

Without waiving any objection, it is admitted that the following firearms were registered in the name of Thomas Walczyk as of September 3, 1999: Colt model 1903, .32 caliber, ser. #: 354507; Colt Govt. Model, .45 caliber, ser. # 40562G70; Smith & Wesson model 629, .44 caliber, ser. # 142639; Walthers Woodsman model, .22 caliber, ser. # 142639; Non-classified, 86S, ser. # A000316; Ruger (SR) Mini-14, ser. # 18465824; Colt, AR150A2 H-BAR, ser. # 325465; and Non-classifed, MAK-90, ser. # 9362979. It is further admitted that such firearms, merely by virtue of being in the residence of 28 Tunxis Street, could be considered to be in his possession.

23.    On September 7, 1999, the Farmington Police seized approximately 2,600 rounds of ammunition, canteens, ammunition belts and other items from 28 Tunxis Street.

**RESPONSE**:

It is admitted that the items seized from 28 Tunxis Street on September 7, 1999 are listed on Exhibit B attached hereto.

24.    None of the ammunition, web belts, or canteens seized on September 7, 1999 was named in the September 4, 1999 warrant.

**RESPONSE**:

It is admitted that the ammunition, web belts, or canteens seized on September 7, 1999 and listed in Exhibit B attached hereto were not specifically identified as items to be seized in the search warrant dated September 4, 1999.

25.    On April 11, 2001, the jury returned verdicts of guilty on the charges of reckless endangerment and disorderly conduct and not guilty on the charge of threatening.

**RESPONSE**:

Based on the written decision of the Connecticut Appellate Court in the case captioned *State v. Walczyk* and reported at 76 Conn. App. 169, 818 A.2d 868 (2003), it is admitted that following a trial in 2001, the jury returned verdicts of guilty on the charges of reckless endangerment and disorderly conduct and not guilty on the charge of threatening as to Thomas Walczyk.

26.     The court found the defendant guilty of two counts of improper storage of firearms in violation of Conn. Gen. Stat. §19-37i and acquitted the defendant on four additional counts of improper storage.

**RESPONSE**:

Based on the written decision of the Connecticut Appellate Court in the case captioned *State v. Walczyk* and reported at 76 Conn. App. 169, 818 A.2d 868 (2003), it is admitted that the trial court found Thomas Walczyk guilty of two counts of improper storage of firearms in violation of Conn. Gen. Stat. §19-37i and acquitted Thomas Walczyk on four other counts of improper storage of firearms.

27.     The State of Connecticut Appellate Court overturned the defendant's convictions finding that there was no probable cause to support the search of the plaintiffs' homes.

**RESPONSE**:

**OBJECTION**. The defendant objects to so much of paragraph 27 because it makes no sense as phrased. None of the defendants in the present action, Captain James Rio, Detective Brian Killiany, Sergeant James Jepsen, Sergeant William Tyler, Corporal Angela Deschenes and Officer Shawn Brown, have ever been convicted of a crime. Accordingly, they could never have a conviction against them overturned.

Without waiving any objection, it is admitted that the Connecticut Appellate Court by written decision in the case captioned *State v. Walczyk* and reported at 76

Conn. App. 169, 818 A.2d 868 (2003), overturned Thomas Walczyk's convictions for disorderly conduct, reckless endangerment in the second degree and improper storage of a loaded firearm.

THE DEFENDANTS,
JAMES RIO, BRIAN KILLIANY,
JAMES JEPSEN, WILLIAM TYLER,
ANGELA DESCHENES and SHAWN
BROWN


By /s/ John J. Radshaw, III
    Thomas R. Gerarde, ct05640
    John J. Radshaw, III, ct19882
    Howd & Ludorf
    65 Wethersfield Avenue
    Hartford, CT  06114
    (860) 249-1361
    (860) 249-7665 (fax)


## CERTIFICATION

This is to certify that a copy of the foregoing has been sent, via certified mail, to the following counsel of record this 4th day of September, 2003.

Jon L. Schoenhorn, Esquire
Jon L. Schoenhorn & Associates
97 Oak Street
Hartford, CT  06106

/s/ John J. Radshaw, III
Thomas R. Gerarde
John J. Radshaw, III

8

```
 1        Q.    Okay.  And, you said that was in regards to a
 2   civil lawsuit; is that right?
 3        A.    That is correct.
 4        Q.    Could you please tell me briefly what the
 5   nature of that civil lawsuit was?
 6        A.    Was an action for a-- to quiet title on a
 7   certain piece of property.
 8        Q.    Okay.  And, were you a Plaintiff or a
 9   Defendant in that lawsuit?
10        A.    Plaintiff.
11        Q.    Were there any other Plaintiffs other than
12   you?
13        A.    No.
14        Q.    What piece of or parcel of property did you
15   seek to quiet title?
16        A.    Oh, it's listed in the land records as
17   easement parcel A, B, C and D.
18        Q.    And, is that near your residence at 28 Tunxis
19   Street?
20        A.    Yeah.  It joins.  Parcel A adjoins it.
21        Q.    And, where are parcels B, C and D?
22        A.    Join.  Parcel C adjoins my mother's property
23   and the other are at either end.  It's all one piece of
24   property.
25        Q.    And, who was or who are the Defendants?
```

# Attachment 2

9

```
 1      A.    Barberino Realty & Development Company

 2  Corporation.

 3      Q.    And, it's your testimony that you just sued

 4  Barberino, the company?

 5      A.    Well I guess he was the Defendant as an owner

 6  of the company.

 7      Q.    If you don't let me--

 8      A.    I don't know exactly, you know, I don't

 9  remember exactly the ins and outs of the legal --

10      Q.    And--

11      A.    -- business.

12      Q.    And, do you remember when that action

13  started?

14      A.    Maybe '95, I believe.  I am not sure.  I

15  think.

16      Q.    And, who was your lawyer at the time that you

17  brought this lawsuit?

18      A.    From West Hartford.  What the heck was his

19  name.  I have to look it up; it's been so long.  I am

20  not sure exactly what his name is.  I don't remember it

21  at the moment.  It escapes me.  I could find it out.

22  Begins with an M.

23      Q.    It wasn't somebody named Conway?

24      A.    No.  Demarco.  Demarco was the last name.

25      Q.    Do you know if he's still practicing law
```

1  27 Tunxis Street?

2      A.   You mean with the easement parcels that were

3  in possession with the property at the time?  We had--

4      Q.   Let's start with just the, with 27.  What 27

5  is today?

6      A.   With the easement attached, it's a parcel--

7  you said parcels.  It's parcels D.C. and B.  And 27

8  Tunxis Street, that's attached to the property, which

9  is approximately, I don't know, four or five acres.

10 That piece and parcel A at the time was undeveloped and

11 that was part of it.  So the whole piece of land is

12 approximately eight acres.

13     Q.   Okay.

14     A.   And it adjoins state land.  There's three

15 thousand acres of open space and sanctuary that abut.

16          MR. SCHOENHORN:   Can he finish.  I don't

17     think he finished.  Did you finish?

18     Q.   I was just telling you I know absolutely

19 nothing about the geography of Farmington, so that is

20 why I would like you to indulge me?

21     A.   Well, it's one of the last open space areas

22 in town.

23     Q.   And, how big a parcel of land is 28 Tunxis

24 Street?

25     A.   Six tenths of a kicker.

1  right to go on that property and I requested them to

2  uphold the law, enforce the law, it was Lieutenant

3  Rio.  Capodiferro told me to call the police and they

4  will uphold the law.  So I called the police and

5  requested that they uphold the law.

6      Q.   I wonder if you would indulge me because I've

7  never been on your property and I don't know how the

8  parcels of your land relate.  I wonder if you would

9  draw me a diagram, and before you start I would like

10  you to put 27 and 28 Tunxis and so that we can talk

11  about the specific properties and parcels A, B, C and

12  D.

13          MR. RADSHAW:   And I'll stipulate that it's

14      not-- that Mr. Walczyk isn't a surveyor or

15      draftsman in this regard, and this is strictly for

16      illustrative purpose.

17          MR. SCHOENHORN:   Not to scale.  We agree

18      it's not to scale.

19          MR. RADSHAW:   And it's absolutely not to

20      scale.

21          THE WITNESS:   All right.

22          MR. RADSHAW:   Let's go back on the record

23      now.  I am going to mark this as the next Exhibit

24      in a minute.

25

1  BY MR. RADSHAW:

2       Q.   But, where you have written 27 on the map and

3  there's the road out in front of it, that is the road

4  that continues?

5       A.   Yeah.  Tunxis.

6            MR. SCHOENHORN:   Let him finish his question

7       before you interrupt please.

8       Q.   And is this point near 27 where the dead end

9  aspect of the road is?

10      A.   Indicating.

11      Q.   And, you are gesturing to where the locked

12  gate was; is that right?

13      A.   Yes.

14      Q.   So, I am looking at the map and I am--

15      A.   And would one side--

16      Q.   And on one side you have written 20/28 and

17  that is 28 Tunxis street where you live today; is that

18  right?

19      A.   That is right.

20      Q.   And then there's 21, 29 and 27 and it looks

21  like 27 in the back is surrounded by parcels D, C, B

22  and A?

23      A.   Right.

24      Q.   Right.  Now, is this empty area beyond D, C,

25  B and A, is that the federal land or the state land you

1  were telling me about?

2      A.   No.   This is the town's land right here.

3  There's a little park in here and all this back in here

4  from here on is the state land over to Route 6 and over

5  to Meadow Road and over to 177.   It's like, like a mile

6  this way.

7           (Indicating.)

8      Q.   From 27 towards the section of the diagram

9  that says gate, are there houses there?

10     A.   Yes.

11     Q.   Now, the gate at the end of the road, is that

12 gate there still today?

13     A.   No.

14     Q.   Okay.

15     A.   No.   I moved it over onto my property here.

16 Actually they plowed it down with their skidder.   I

17 picked it up and dug holes and put it over here.

18     Q.   And you kind of drew in what looks to be a

19 road.

20          Is that a paved road?

21     A.   No.   It stops.   The pavement did stop at that

22 time.   It stopped about here.

23          (Indicating.)

24     Q.   And, where you have made that mark, that is

25 like in the middle of parcel thirty one?

65

1      A.   Comes down, yeah.

2      Q.   Okay.  Now, has parcel A been developed

3  today?

4      A.   Yes.

5      Q.   Okay.  And, has the road been paved down in

6  that direction?

7      A.   Yes.

8      Q.   So essentially Tunxis Street today is longer

9  than what it was?

10      A.   Well this is private.  It's a driveway.

11      Q.   Okay.

12      A.   Well they paved, a little more then paved,

13  continues, continued, but this is not Tunxis Street

14  until-- they call it 28 or 30, that I believe, and this

15  is a private road.

16           (Indicating.)

17      Q.   So, do they call it Tunxis Street or does it

18  have another name?

19      A.   Well, it has some other name I don't know.

20      Q.   About how many houses do you think are down

21  there?

22      A.   There're fifteen, I believe.

23      Q.   Okay.  And then that road, that private road

24  dead ends at some point?

25      A.   Yeah.  Goes around like that.

66

1              (Indicating.)

2         Q.   Okay.  All right.  And, so we get back to

3    where my line of questioning started before where

4    you've drawn the skidder.  That's where they parked the

5    log skidder when they bulldozed your gate?

6         A.   Gate.

7         Q.   Is that right?

8         A.   That's correct.

9         Q.   Now, you had testified right after I had or

10   right before I asked you to draw this diagram, that

11   some time earlier in 1999, before August 1999, you went

12   and spoke to someone at the Farmington Police

13   Department; is that correct?

14        A.   That's correct.

15        Q.   And, do you recall when you went down to the

16   Farmington Police Department and had this conversation?

17        A.   Well I know it was after one year had

18   transpired from the date of the final disposition on

19   the land case, because I had went to tell them that

20   according to the law, he had lost all rights to that

21   property because he did not act within the one year

22   statute of limitations and take possession of the

23   property.  That any trespasses on him is illegal, by

24   him would be illegal after that point and it had

25   already transpired.

1    Q.   I just want to understand how you got to that

2  conclusion, because we talked about earlier today your

3  1995--

4    A.   1995 lawsuit was ended by 1997.

5    Q.   Right.  And you testified and told me earlier

6  today that as a result--

7    A.   He quieted title.

8         MR. SCHOENHORN:   Let him finish the

9    question.

10   Q.   Yeah.  That as a result of the 1997 judgment,

11 he had quieted title to parcels A, B, C and D and that

12 it was your understanding, you told me, that you had no

13 right to parcels A, B, C and D; is that correct?

14   A.   Until the one year statute of limitations had

15 expired, yes, that's true.

16   Q.   And please tell me what you mean by the one

17 year statute of limitations?

18   A.   The Connecticut Statute 52-575 dealing with

19 ownership by absentee landlord in possession of

20 property that-- in possession by someone else.  That

21 the absentee landlord, that they have to one year after

22 being notified it's in the possession of somebody else,

23 they have one year to take possession of the property.

24 And since I had in there lock and key, the gate was

25 locked and he had not taken possession of the property

68

1    within that one year, that the law, the statute of

2    limitations had run and he had no, no legal right to

3    set foot on the property; that he had to take me to

4    Court and bring an action to eject me in order to get

5    on the property.

6          Q.    Okay.  And, when did you put this gate up?

7          A.    Right after my brother and I had that

8    argument, I dragged his junk car out onto the street

9    and then put the gate up.

10         Q.    And, where was his junk car parked?

11         A.    It was parked on parcel C.  It wasn't a

12   junk.  I mean it was an unused car.

13         Q.    Okay.  So, it's your testimony--

14         A.    I had a friend of mine with a car carrier

15   pick it up and take it and drop it in front of the

16   house right where 27 Tunxis Street right here.

17              (Indicating.).

18   Q.    So it's your testimony--

19              MR. SCHOENHORN:    Can we have this marked

20         please.

21              MR. RADSHAW:    Yes, absolutely.  Could you

22         mark this as Defendant's Five.

23              (Whereupon the above document was received

24         and marked as Defendant Deposition Exhibit Five

25         for Identification, as of this date by the Court

1     Reporter.)

2          MR. RADSHAW:   Just so the record is clear,

3     the document we have marked as Defendant's Exhibit

4     Five, is the diagram drawn by Mr. Walczyk that we

5     have been discussing.

6     Q.   Now Mr. Walczyk, so I am clear, that the gate

7     we have been discussing that was bulldozed down in

8     1999, is it your testimony that you put that gate up in

9     1996?

10    A.   Yes.

11    Q.   And that gate was up from 1996 until it was

12    bulldozed in late August 1999; is that right?

13    A.   That's correct.  Locked.

14    Q.   And so that I understand this correctly--

15    A.   The gate over here too on this end of the

16    property.

17         (Indicating.)

18    Q.   Okay.  Now you drew another gate.  What gate

19    is that?

20    A.   That blocked access to the neighbor's

21    property.  It is sewer line right away went through

22    here and there was a gate here for people to go

23    through.  There's the old road came up here.

24    Q.   Is there a road on the other side of that

25    other gate?

1      A.    Well they put a berm, yeah.    Becomes a

2  driveway that goes up to the next condominium unit.    So

3  it's a roadway.    They have down here, they got tennis

4  courts and a pool and stuff.

5      Q.    Okay.    If I were to drive onto Tunxis Street

6  today, can I drive down Tunxis Street through the

7  private drive that was developed on parcel A and come

8  out in some other development?

9      A.    No.    There's a house right here.    No.

10     Q.    Okay.    That would certainly stop me.

11           Now, so that I am clear with this, after

12  Barberino Realty received judgment in its favor?

13     A.    He had one year to take possession.

14           MR. SCHOENHORN:    Just let him ask the

15           question.    You keep doing that.

16     Q.    It's okay.    I know you know the facts of this

17  better than I do, and that is why I just want to sort

18  it out.

19     A.    Right.

20     Q.    And after your appeal-- let me back up and

21  start again.

22           After Barberino Realty received judgment in

23  its favor, and after all of your appeals were exhausted

24  to overturn that judgment, is it your testimony that

25  Barberino had to take possession of the property or

1  Barberino would lose --

2       A.   The right--

3       Q.   -- the legal right to that whole piece of

4  property?  Is that your testimony?

5       A.   He would lose the right to go onto the

6  property.  He wouldn't quiet the title.  That would be

7  the result of an action that he would have to bring

8  against me to eject me, and then he could quiet the

9  title in his name officially, if the Court agreed with

10  him.  But the facts are clear.

11       Q.   But, so, did the court agree with Barberino

12  on his counterclaim in your 1995 lawsuit?

13       A.   What?  To quiet the title for him?

14       Q.   That's right.

15       A.   Yeah.  Apparently, obvious they quieted title

16  to him.

17       Q.   And so it's your testimony that he would have

18  needed to quiet title again because he did not come

19  and--

20       A.   Take possession.

21       Q.   -- and knock down your gate and take

22  possession within the one year after the end of your

23  appeals and thus eject you from the property?

24       A.   That's correct.  Well he didn't have to eject

25  me.  But--

1    Q.    Okay.  Now, did Barberino ever bring a

2  lawsuit to eject you from the property or quiet title

3  to the property, the title to parcel A after the

4  proceedings attendant to the 1995 lawsuit?

5    A.    Well he didn't have to.

6    Q.    And, why didn't he have to?

7    A.    Because he illegally took possession of,

8  after the police stopped me from or the police refused

9  to uphold the law and force him to go to Court.

10    Q.    And the law you are referring to is the one

11  year statute of limitations you were talking about

12  earlier; is that correct?

13    A.    Yes.

14    Q.    So, when you were telling me that you went to

15  see Capodiferro about the land dispute, is it possible

16  that you had that conversation with him in early spring

17  of 1999?

18    A.    Not very early.  Had to be after, it was

19  after the one year.  That was the purpose of it, was

20  after statute had run.  I would not go and tell him

21  before that because that would blow the--

22    Q.    But it was clear it was before August 1999;

23  is that right?

24    A.    Oh yes.  Definitely before August.  Yes.

25    Q.    Did you tell Capodiferro that you were in the

1  process of getting a new ruling or a new lawsuit to

2  reverse the 1997 judgment in favor of Barberino?

3      A.   I don't know if I could get a new lawsuit.  I

4  don't know if I told him that.  I might have told him

5  that I intended to see that he was prosecuted for

6  perjury here in his trial.  I might have mentioned

7  that.

8      Q.   Okay.  But there came a time when the

9  Farmington police came out to Tunxis Street in August

10 of 1999; right?

11     A.   That's correct.

12     Q.   Can you tell me the first thing that happened

13 to you, do you recall, on August 30, 1999 with the

14 Farmington police?

15     A.   I don't know.  I talked to him about it, you

16 know, and I walked down with him.  Had my daughter

17 videotape everything, everything.  My daughter was

18 there.  I greeted him, she went with us.  I showed him

19 the-- showed him where the skidder was.  I explained to

20 him and showed him the locked gate that was smashed

21 down.  I tried to give him a copy of the law that said

22 they had no right to be on the property, and I would

23 like to have him uphold the law.  And we had an about

24 twenty, thirty minute discussion.

25     Q.   Okay.  And, do you recall the name of this



Attachment 3